THE STATE, STEPHEN B. RANSOM, PROSECUTOR, v. DANIEL BLACK.

1. The right to vote, secured by the constitution, can only become operative by legislation ; and any reasonable legislative regulation for the purpose of securing an enforced secrecy of the ballot, is not a deprivation of a right to vote.

2. The clause in section 63 of the election act of 1891, prohibiting any electioneering on an election day within one hundred feet of any polling place, is a reasonable police regulation to secure good order about the polls.

3. An objection that the clause in section 30, which provides that if any ballot shall have thereon a mark, sign, signature or device other than permitted by the act, it shall be void, is unconstitutional, because the voter may lose his vote by the fraud or neglect of those preparing the ballot, is not sound. The most stringent directions are given respecting the preparation of the official ballots, and the law presumes that they will be obeyed.

4. The clauses which provide that only those parties casting a certain percentage of the vote of the last election, and those parties presenting petitions signed by a certain number of voters, shall be entitled to official ballots, is a valid regulation to restrain the number of ballots to be printed and distributed within reasonable limits.

5. The fact that a voter may be compelled, in exercising his right to vote, to deposit a ballot having upon it the name or style of a party of whose principles he disapproves, is not an illegal deprivation of a right to vote ; for if a voter exercises his right to erase the names of all the candidates on the ticket, and inserts the names of persons who stand for an entirely different principle, the heading of the ticket becomes meaningless as an expression of the voter's sentiments.

This writ of *certiorari* brings up a judgment of the Court of Common Pleas of Hudson county affirming a judgment of the Second District Court of Jersey City. The action was brought to recover the sum of $25 as a penalty under section 63 of an act entitled " A further supplement to an act to regulate elections," approved April 18th, 1876, which supplement was approved May 28th, 1890, and is to be found in *Pamphlet Laws of* 1890, *page* 361.

Argued at February Term, 1892, before JUSTICES DIXON, REED and GARRISON.

*Pro se, Stephen B. Ransom.*

For the defendant, *Thomas J. Kennedy.*

The opinion of the court was delivered by

REED, J. Section 63 of the new Election act reads as follows : " No voter shall knowingly vote, or offer to vote, any ballot except an official ballot enclosed and sealed in an official envelope, as by this act required. Any person violating this provision shall incur a penalty of $25 for each and every offence, to be recovered by an action of tort before any court of competent jurisdiction by any person who *bona fide* shall first bring suit." The defendant below voted a ballot printed at his own expense, with no endorsement upon the back, as is required upon official ballots, and therefore admittedly contravened the section just mentioned.

This is admitted by the prosecutor, but he attacks the judgment by challenging the validity of the statute prescribing the penalty.

The indictment against the act sets out a number of particulars, in which it is charged that the statute is in conflict with the state constitution.

The parts of the statute which are thus attacked are the following :

*First.* The clause in section 63, which prohibits electioneering on election day within one hundred feet of any polling place.

*Second.* The last clause of section 63, which provides that any marked ballot or official envelope shall not be counted.

*Third.* The provisions of section 28, which entail upon those voters who do not belong to a party who has nominated candidates, but who wish to vote a party ticket of their own, the trouble of procuring a petition signed by a certain per cent. of the entire vote cast at the preceding election as a condition precedent to adopting a party name and having tickets printed officially.

*Fourth.* The provisions of section 33, limiting the number

of votes officially printed for petitioners to one-half of the total number of votes cast at the preceding election.

*Fifth.* The provision of section 32, which provides that the official ballot shall have upon it the name or title of the party, or principles of the party or petitioner making the nomination.

The clauses of the constitution which are chiefly relied upon by the prosecutors, are the first clause of the first article of the Bill of Rights, which guarantees the right to enjoy and defend life and liberty; to acquire, possess and defend property, and to pursue and obtain safety and happiness; and the second article of the constitution, which provides that every male citizen of the United States of the age of twenty-one years, who shall have been a resident of this state one year, and of the county in which he claims his vote five months next before the election, shall be entitled to vote for all offices that now are or hereafter may be elected by the people.

It will be observed that all the points except the first made against the statute have reference to a right to vote. In respect to these grounds of complaint, it may be remarked that the clause in the Bill of Rights seems to have no pertinency. The clause in the Bill of Rights is a general recognition of those absolute rights of the citizen which were a part of the common law.

Whether any advantage accrues to the citizen from these declaratory clauses in the constitution has been questioned. 1 *Kent Com.* 614.

But whether or not some or all of these rights were inherent in the citizen without constitutional recognition, is unimportant in the present discussion. It is unimportant, because it will be observed that the material phases of the prosecutor's complaint are, that he has been illegally limited in, or obstructed in, the exercise of his right to vote. If, therefore, the first mentioned clause of the constitution is to be invoked, it is essential that the right of suffrage shall be classed among those absolute rights therein recognized. Nothing, however, is established more unquestionably than that the right of suffrage is not an absolute right. No such right exists, unless specifically con-

ferred by a constitution or a statute. It is a political right, and does not flow from the declaratory clauses of the Bill of Rights. 1 *Story Const.* 580, *Cooley Const. Lim.* 599.

The question then is, whether any of the features of the statute illegally obstructs the voter in exercising the right which is expressly conferred upon him.

The right conferred is the right to vote for all elective offices. As to when, where and how the voting is to take place, is left to the legislature. Without the intervention of the legislature the privilege conferred by the constitution would be fruitless. A wide field, therefore, is left open for the exercise of legislative discretion. The days upon which elections are to be held, the hours of the day or night during which, or between which, votes shall be received, must be determined by the legislature. So, too, the places where each election is to be held, and the size of the voting precinct, and whether the size shall be measured by territory or population, must also be settled by direct or delegated legislative authority. The widest field for the exercise of legislative wisdom and discussion is in adjusting the method by which the sentiments of the voter shall be obtained and canvassed. The constitution does not even prescribe that the voting shall be done by ballot, and, in fact, long after the adoption of the present constitution, township elections were conducted otherwise.

In adopting a scheme for these purposes, it will require little thought to perceive that many considerations beside that of the voter's convenience must be regarded. The problem has been, and still is, how to gather the prevailing sentiment of the voting body so as to best conserve the purposes of popular government. The objects which have seemed the most important have been to exclude unqualified persons and to shield the legal voter from the influences of coercion or corruption. The discovery of a scheme of voting which would the best secure these objects, had long been in the thoughts of statesmen and reformers. The ballot itself became the method of registering the will of the voter in Great Britain only after a long period of agitation. The advantage of a system of

secret voting was stirred by the Benthamites as early as 1817. *Encycl. Brit., tit. "Ballot."* In 1835 the judges of the Court of King's Bench doubted whether by ballot was a legal mode of holding an election in a parish to fill a vacant curacy, under a custom that the parishoners should elect a successor to a deceased curate. *Faulkner* v. *Elger*, 4 *Barn. & C.* 449.

The objection of the judges to the ballot was mainly that if a person voted who was afterwards ascertained to have been disqualified, there was no way of telling how he had voted.

After years of discussion the ballot was adopted in local elections in Manchester and Stafford in 1869, and was in 1872, by the passage of Mr. Foster's Ballot act (55 and 56 *Vict.*, c. 33), introduced in all parliamentary and municipal elections, except parliamentary elections for universities.

But the mere use of the ballot has been shown by experience to be ineffectual to prevent coercion and corruption. The factor of supreme importance calculated to bring about this result is an enforced secrecy respecting the choice of the voter. So long as the ballot can be marked for identification, or the vote of the citizen can be disclosed in any way, the voter is liable to be called to an account for his conduct. The coercionist will treat his refusal to vote a marked ballot as an adverse vote. The corruptionist will have the means of assuring himself that the vote he has purchased will be delivered. The thoughts of those interested in pure elections were turned by these considerations to the device of some scheme for voting which would secure compulsory secrecy, and, at the same time, provide for an orderly, equal and convenient exercise of the right of suffrage. The honor of first devising such a plan belongs to the government of the province of South Australia. In 1856 a constitution was adopted by that colony granting popular representation and manhood suffrage. In 1857-8 the Election acts were passed, which typifies the system which has spread to two other continents under the name of the Australian Ballot System. The practical results of the introduction of this system is shown by the testimony of Sir Robert Richard Totten, who, as a member of the government of South Aus-

tralia, had opposed the introduction of the secret ballot. His testimony, however, is that rioting and disorder had disappeared. Intimidation by landlords and trades unions alike had disappeared entirely, and the very notion of coercion or improper influences had died out. *Wigmore's Australian Ballot.*

The good results of the Australian system induced the passage of the act of 1872 in England, already mentioned, which is based substantially on the South Australian method. Wherever similar election acts have been put in operation, the sentiment of the community has been generally favorable. While they do not accomplish all that is desirable in the way of extirpating corrupt practices, their effect has undoubtedly been to secure quieter elections, to greatly reduce corruption, and almost entirely destroy coercive influences.

Now, I think, this recapitulation of the purpose and results of the class of acts of which our own is a specimen, has a pertinency to the questions mooted in this case, for I think that any provision in such act which is likely to bring about a result which conduces to the purity of popular elections, should receive a favorable consideration. It is, of course, true, that if the effect of any provision is to shut off a voter from the ballot box, such provision must fall before the constitutional guaranty of the right to vote.

But in measuring cases of mere inconvenience, expense or sentiment, the existence of a salutory purpose and the likelihood of the provision tending to accomplish that purpose must weigh greatly in determining the reasonableness of the statutory regulation.

With these general remarks, let us look at the several points made against the constitutionalty of the present act.

The first ground of complaint is, that no electioneering is permitted on election day within one hundred feet of any polling place. Section 63. This clause is criticised as an infringement upon the constitutional right of every citizen to express his sentiments upon public men and measures, and his right to persuade his fellow-citizens to vote for the advancement of his

opinions.   I find no substance in this criticism.   The regulation is a proper one to avoide disturbance and disorder immediately about the polls.   While a man has a right to express his opinions, the exercise of this right, like all other general rights, is the subject of reasonable police regulation.   A man cannot rise in church during service and deliver a political harangue, or shout his convictions about public measures at midnight in the streets of a city, without liability of being arrested as a disorderly person.   The restriction is entirely proper, and also quite trivial, for all the electioneering citizen has to do is to invite the voter to whom he wishes to express his sentiments to come outside of the hundred feet limits.   It is further observable that this clause has nothing to do with the voting of an unofficial ballot.   If it should be regarded as unconstitutional, it is nevertheless a separable part of the act, which does not in any way affect the present discussion.

The second point of attack is the part of section 63 which prohibits any person from putting a mark upon the face or back of a ballot or envelope by which the ballot or envelope may afterwards be identified by any other person as the one voted by him ; and section 30, which provides, that if any ballot shall have thereon any mark, sign, designation or device other than permitted by the act, whereby the said ballot may be identified or distinguished from other ballots cast at such election, such ballot shall be absolutely void.   The point made against these provisions of the act is, that the voter has no hand in the preparation of the ballot, but that a mark or irregularity may get upon the ballot in its preparation which may prevent its being counted.   It is therefore argued, that a voter, through no fault of his own, may be deprived of his vote.   This criticism is grounded upon a presumed fraud or neglect of duty by the persons upon whom the duty of preparing the ballots is imposed.   It is, of course, entirely true, that it is possible for a vote to be rejected because of the fraud or carelessness of such person or persons.   But the same remark is true under any scheme which may be devised.   Votes have

been suppressed, and are constantly miscounted, in making up the results of elections.

An admission of the soundness of the present criticism would destroy the entire scheme of securing a secret ballot. Secrecy is impossible without uniformity in the appearance of the tickets and envelopes. That uniformity cannot be obtained unless the preparation of the ballots is put in the hands of some specified person or persons. The guards and restrictions placed around the preparations of the ballots are of the most explicit and stringent kind. The county clerks or municipal clerks, by section 32, are directed to cause the ballots to be printed on plain white paper, &c., without any mark, word, device or figure thereon, except as in the act provided. By direction of section 40 the ballots are to be in the possession of the clerks five days before the election, subject to inspection by candidates and their agents. If any mistake is discoverable, the clerks are directed to correct the same without delay by causing new ballots to be printed.

By the terms of section 64 any printer is liable to conviction for printing a ballot otherwise than as directed by the clerk.

The law presumes that these prescriptions of duty will be performed. It never presumes a neglect of official duty. I can perceive no substance in the objection raised against this feature of the act.

The third and fourth grounds of attack upon the act may be considered together. They are directed against the provisions of section 28, providing for the nomination of candidates by petition, and of section 33, regulating the printing of official ballots.

The first of the complaints against this legislation is that the voter who is not a member of a party which cast five per cent. of the entire vote cast at the preceding election is subjected to hardships from which other voters are free. To apprehend the force of this complaint, it is necessary to observe that, by the terms of section 28, any political party which, at the preceding election, polled not less than five per cent. of the votes

cast in the election district, may nominate and certify the names of candidates to the secretary of state (in case they are state officers), or to the county clerk if they are county officers, or to municipal clerks if the officers are municipal. These names are printed, without further party action or expense, upon an official ballot. But voters who are members of a party which cast less than this five per cent of votes, or voters who desire to organize a new party, can only obtain an official ballot by a petition. This petition must be signed, in case of a state officer, by qualified voters in number not less than one per cent. of the vote cast at the preceding election for members of assembly; and in case of a district, county, city or township office, by not less than five per cent. of such vote. The number of such signers, however, need not exceed two hundred altogether.

It is insisted that the labor of gathering signatures and putting this petition into legal shape thus entailed upon a class of voters, is an unconstitutional discrimination against it in favor of the members of the older and larger parties.

The second complaint is, that there is further discrimination in printing tickets. By directions contained in section 33, the county or municipal clerk is to provide for each election district two hundred and fifty ballots for every fifty or fraction thereof of votes cast therein by such party at the last preceding election for members of the general assembly, except in case of nominations by petition by any party that cast no votes for any candidate or candidates at the last preceding election for members of the general assembly. In such case the ballots furnished at public expense shall be equal in numbers to onehalf of the total number of votes cast in the election district at such last preceding election.

It may be observed in passing, that this provision places no obstacle in the way of any party obtaining all the ballots it may wish. It only prescribes what number of said ballots shall be printed at public expense. The number of ballots printed for each party at the public expense bears relation to the number of voters of that party, so far as that number can

be approximated by the result of the preceding election. When an entirely new party puts candidates in nomination, this method of calculation is of course impracticable, and the rule adopted seems reasonable. It may give to the new party more or less ballots than to some of the parties entitled to make nominations by convention.

Now, in passing upon the validity of both of these provisions, it is to be noted that they in no way impede the voter in exercising his right to vote for any particular person or persons for any office. He is at liberty to vote for any person by simply erasing a name from, and writing the name of the favored person upon, any official ballot. It is, therefore, apparent that the right, in the exercise of which it is claimed the voter is embarrassed, is not the right to vote, but the right to form a party and vote as one of that party. By the very frame of the complaint, the existence of parties is recognized as a part of the practical machinery for conducting elections.

Now, the plan of providing official ballots, which plan is the keystone of the secret ballot system, involves necessarily some limitation upon the number of party tickets and the number of party candidates. Of all the acts which have been passed to bring about this system of voting, I am sure none can be found which does not in some way circumscribe the privilege of demanding a place upon the official ballot as a party, or as a candidate of a party. If it was left in the power of each voter, or each coterie of three voters, to adopt a party name and demand that an official ballot should be printed at public expense, and distributed to each voter at the polls, the polls would probably be littered with ballots "thick as autumnal leaves that strew the brooks in Vallombrosa." Great expense, labor and inconvenience would result, without any appreciable benefit to the voter or to society. These regulations may not be the wisest that could have been adopted, still they are regulations which do not seriously impair the right of any citizen to vote. They are intended to restrict the number of party tickets within reasonable limits, while, at the same time, permitting any body of

citizens whose number is sufficient to give importance to a concerted political movement to organize as a party.

The last ground of complaint which I shall consider is the following:   That a voter whose sentiments are not in accord with the principles of any party having an official ticket, is practically deprived of his vote, because he cannot vote unless he votes a ticket having upon it the name of a party of whose principles he disapproves.   This point is based upon the provisions contained in section 32, which directs that the nominees of each party or group of petitioners shall be printed on separate tickets, underneath the title or name of the party or petitioners making such nominations as designated by them in their certificate or petition, except when there is no designation of name or title, then under the title of "Independent Nominations."   It is obvious, therefore, that every official ballot distributed at any polling place may have upon it the name of a party.   It is, therefore, insisted that while a voter has a right to replace any name upon one of such ballots with the name of a candidate of his choice, yet he cannot deposit his ballot without signifying his approval of the principles of the party whose name heads and remains upon the ticket.   This, it is urged, couples with the privilege of voting a condition which may practically deprive a conscientious voter of his suffrage.

The point of this complaint, of course, rests upon the assumption that if the voter deposits his ballot, he must do so with the name or style of the party still upon it.   It is suggested that the voter has the privilege, under the statute, to erase the name of the party from the ballot.   The language of section 40 is as follows:   "Nothing in this act contained shall prevent any voter from erasing from his ballot any name or names thereon printed, or from writing or pasting thereon the name or names of any person or persons for whom he desires to vote for any office."

Now it is suggested that this language leaves the voter free to erase the name of a party.   This construction is put upon the literal words of the act, which, while leaving power to

add only names of persons, has no express limitation upon the license to erase names. The name of a party, it is thought, is, therefore, included in the latter class of names.

If I was driven to say that either the legislature intended to leave this power in the hands of the voter, or else they stripped him of a constitutional right, I would yield my assent to this view. But I do not think that it can be said that if the voter is denied this privilege, he is deprived of his constitutional right. Viewing the clause of the act, without being hampered by any question of constitutionality, I think that the legislature did not intend to leave the voter free to mark off the heading of a ballot. In my judgment, the names he is privileged to erase are of the same kind as the names he is permitted to add.

The references to this heading of the ticket are in section 27, where it is directed that " the certificate of the officers of the nominating convention shall designate in not more than three words " the title or name of the party or principles " which such nominating body represented." In section 28 it is provided " that the petition may also designate in not more than three words " the title of the party or principles " which the candidate therein represent." It is this title or name of the party or petitioners, as designated by them in their certificate or petition, under which the nominations are to be printed. I think it will appear that throughout the statute, whenever the heading is alluded to, the word " name," when used, is accompanied by the word " title."

Now a title may be, and often is, a name. But I think it has a signification different from " name " as it is used in the act. A " Title of Principles " may mean something which is not properly styled a name. A ballot headed " For Ballot Reform " or " For Free Coinage " would be, I think, entirely legal; and yet the caption of the ticket could not be properly called a name. The use of the word title in section 32 gives color to this notion. Speaking of printing the ballots for petitioners, the language of the section is : " If there be no designation of name or title (in the petition), then under the title of

'Independent Nominations.'" This heading is not a name, and so is styled a title, using the word title in the sense in which it is used as indicating the contents of a chapter in a book.

Now I think if it had been intended to leave the voter free to erase all such headings, the word title would have been used in section 40, coupled with the word name, as it was employed elsewhere in the act.

Then again, it is to be kept in mind that every possible pro-. hibition is enacted against marking a ballot. The power to erase the names of candidates was absolutely necessary under the system adopted. For this reason alone was it permitted.

But aside from the constitutional difficulty now suggested, and which probably never occurred to the legislature, there was no reason for leaving the voter free to score the ballot by marking out, in any way he pleased, the caption of the ticket. It is not probable that it was intended to put in the hands of the voter this additional opportunity to mark his ballot for identification. For these reasons I conclude that such license does not exist.

But this conclusion does not lead me to think that the voter is deprived of a constitutional right. Although I regard this as the only serious question raised by the prosecutor, I have, upon reflection, concluded that the obstruction put in the way of the voter is sentimental rather than substantial. We must view the question in a practical aspect. The object to be attained is one of great importance. As already remarked, the plan is necessarily one of considerable intricacy. In planning it, conflicting requirements had to be adjusted and accommodated. The practical operation of the scheme has shown defects, and will display further deficiencies, which the legislature will have the opportunity to amend. While the courts should see to it that no real or unnecessary bar is put in the way of the voter, yet such bar should clearly appear to exist before an inseparable feature of the act is branded as unconstitutional and the statute annulled.

Many features of the act may offend a voter of sensitive feelings and peculiar views. Some voters have sulked and

refused to vote because of the compelled seclusion in preparing the ballot and like requirements. But these exceptional instances cannot create a standard of what should be regarded as an unconstitutional deprivation of the right to vote.

Now assuming that occasions may arise when a voter is compelled to use a ballot with a heading indicating a party or principle of which he disapproves, what significance has it? If he leaves the printed name of a single candidate on the ticket, he, of course, has no right to complain of the title. The candidate stands for the principle indicated by the title. If, on the other hand, he erases each printed name and adds the names of persons who stand for a different principle, what meaning is left in the title? The title is lost when the ballot is deposited. It is not displayed. It is not counted. The only purpose of the title, in respect to the voter, is to aid him to distinguish readily and speedily the different groups of candidates. The whole force and meaning of the vote is in the character and principles of the candidates for whom the vote is counted. In any sensible view, how can it be said that the deposit of such a ballot carries with it an approval of the principles indicated by the title, when the name of every person upon it is an indication to the contrary.

I am of the opinion that no illegal impediment is put in the way of the voter by this requirement.

As to the other matters discussed at the argument, it is enough to say that we find no material criticism of the provisions of the statute.

The judgment below must be affirmed.

DIXON, J. I concur in the affirmance of the judgment of the Court of Common Pleas, and, with one exception, in the propositions supporting such affirmance. The excepted proposition is that which confines to the names of candidates the right of the voter to erase from his ballot the names printed thereon.

The statute which requires the voter to use official ballots, directs that upon those ballots shall be printed " the nomina-

tions of each party, or group of petitioners, * * * on separate tickets underneath the title or name of the party or petitioners making such nominations." Section 32. By the title or name of a party is meant the title or name of the party or principles which a duly organized convention of delegates represented (section 27); and by the title or name of the petitioners is meant the title of the party or principle selected by a prescribed number of votes as that which the candidates whom they nominate represent. Section 28. Thus, by the very words of the statute, the title or name of the party or principle at the head of each official ballot is declared to have a representative character. And not only from the language of the act, but by common understanding and usage, would it be inferred that the voter, by casting a ballot with such name or title printed thereon, expressed his preference for the party or principle so designated.

In the opinion of my associates, the voter must retain one of these party names upon his ballot. He is not required to vote for any candidate nominated by any of those bodies which have obtained official ballots; he may vote for persons whom he knows to be opposed to all these organizations, and to the doctrines which they advocate in public affairs; he may, himself, wish to oppose and repudiate them all, but it is made a condition of his voting that he shall place his candidates under the shibboleth of one of them, and so appear to stand in its ranks. He may express his disapproval of its present selections, but he cannot escape the indication of a general preference for its name or policy.

In my opinion, the legislature could not impose such a condition upon the voter.

The right of suffrage is constitutional, and is conferred in these words (article II., paragraph I.): "Every male citizen of the United States, of the age of twenty-one years, who shall have been a resident of this state one year, and of the county in which he claims his vote five months, next before the election, shall be entitled to vote for all officers that now are or hereafter may be elective by the people." The right thus given is a right to vote for officers. Such voting re-

quires that the voter shall designate the office to be filled and the person whom he desires to fill it, but does not call for any indication of his party associations, his political opinions, or the reasons which induce him to vote for his nominee.

It must be conceded that legislation is necessary to determine who are legal voters, to provide for them the means of voting, to prevent all others from voting, and to ascertain the result of the vote. All legislation conducive to these ends is, therefore, permissible. It is also clear that by a vote is intended the free and honest expression of the voter's choice, and hence statutes tending to preserve the voter from coercion or immoral influences are legitimate, provided they do not impair other rights. Outside of these purposes, I see no room for legislative interference with the right of suffrage.

But I am unable to perceive how it comes within any of these purposes for the legislature to compel the voter to indicate upon his ballot any preference among the parties or principles which other voters may choose to espouse in the election. I, therefore, think that such an enactment would be invalid.

I further think that, by the present law, the legislature did not intend so to enact.

Section 40 of the act says: "Nothing in this act contained shall prevent any voter from erasing from his ballot any name or names thereon printed, or from writing or pasting thereon the name or names of any person or persons for whom he desires to vote for any office."

Independent of the constitutional question, this language gives the right to erase any name or names printed on the ballot. Why not the name of the party or principle? The voter is permitted to write or paste on the ballot only the names of *persons*, but he may erase *any* name, of person or office, or of party or principle.

The narrow construction of my associates fastens upon the exercise of a right that should be encouraged, a condition which is distasteful and deterrent to some voters, and which cannot effect any beneficial result. Such a construction should therefore be rejected.