# CASES DETERMINED

AT THE

# August Term, 1910.

STATE EX REL. McGRAEL and others vs. PHELPS and others.

*October 8—October 15, 1910.*

*Statutes: Construction: Words implied: Primary elections: Regulation: Constitutional law: Impairing right of suffrage: Right of party to place on official ballot: Percentage of votes cast.*

1. To determine the purpose of a statute expressed in literal sense, words necessarily implied from those used, are as clearly a part thereof as the written words.

2. In searching for the purpose of an enactment which, applied in the ordinary sense to the subject thereof, would lead to a result so unreasonable as to suggest that such was not its purpose, some other and a reasonable meaning should be adopted, if one can be found within the fair scope of the language used.

3. In the situation suggested in the last foregoing, the court may "consider the surrounding circumstances, the existing conditions, the evils to be remedied, the objects to be attained," "look at the whole and every part of the statute, to its subject matter, to its effects and consequences, to its reason and spirit," and then read it with all words in place, necessarily or reasonably implied, so as to harmonize and give a sensible effect to every portion thereof and express the apparent intent.

4. In ch. 477, Laws of 1909,—providing that if the aggregate of votes at a primary election for all candidates "for nomination for any one office voted for on any party ballot" shall be "twenty per cent. or more" of the number "cast for nominee of such party for governor at the last general election" the one receiving the most votes shall have his name "placed on the official ballot at the following election" as such party's candidate for such office, and if such aggregate shall be less than such per cent. such person shall have his name placed on such ballot with individual nominations under the designation "independent,"—by necessary implication, the words—for the particular official district involved or words of similar import— should be deemed in place after the words "for any one office"

VOL. 144 — 1

and the words—in such district or words of similar import—after the word "governor."

5. The literal sense of the words "vote cast for nominee of such party for governor," standing alone, is so contrary to the apparent legislative intent, that words, as before indicated, should be deemed in place by reasonable, if not necessary, implication.

6. In general, a legislative interference with the elective franchise must stand the test, at least, of these fundamentals of the state constitution:

    (a) The express and implied inhibitions of class legislation;

    (b) The recognized existence and inviolability of inherent rights;

    (c) The constitutionally declared purpose of government;

    (d) The express guaranty of the right to vote.

7. Sec. 1, art. I, of the constitution is a prohibition, by necessary implication, of legislation inconsistent therewith.

8. The right of suffrage includes the right to form political parties, and the right of each party to have all the machinery, not reasonably prohibited by law, for making its organization effective as to the policy of its members, by electing officers in harmony therewith.

9. Every legislative interference with freedom of voters to form political organizations and act under their respective party names is, at the same time, an interference with the right to vote; so the limit of power as to one is substantially the limit as to the other.

10. Rights mentioned in the last foregoing are included in sec. 1, art. I, of the constitution and are, by necessary implication, protected thereby from undue legislative interference, and are likewise protected by the limitation (in the words of grant) in sec. 1 of art. III of the constitution.

11. Notwithstanding constitutional inhibitions of legislative interference with the right to vote and rights incidental thereto, there is a legitimate field of legislative activity in the nature of regulation.

12. The field of legislative regulation mentioned does not extend beyond making laws which are reasonable.

13. The scope of reasonable regulation is indicated by its purpose, viz.: to conserve guaranteed rights and promote their efficiency.

14. The office of regulation being to conserve, a regulation going clearly beyond, into the field of impairment, is unreasonable.

15. The extent to which the legislature may go in the way of regulation of rights is primarily a matter of legislative judgment, subject, however, to judicial review.

State ex rel. McGrael v. Phelps, 144 Wis. 1.

16. The review mentioned has no regard to expediency; it has regard only to whether, from any fair point of view, the regulation, as a conservation measure, is legitimate, every reasonable doubt being resolved in favor thereof.

17. A regulation which necessarily tends to afford one political party of substantial status a better opportunity for efficient existence than another, however large, or materially impair or prevent fair opportunity for any organization of voters of substantial numbers and standing to compete for favor, is an unreasonable interference.

18. A legislative interference with freedom, as regards political party organization and contest, which naturally impairs opportunity for members of any political party of substantial significance to efficiently maintain their organization, and, to that end, present their party candidates and principles, as such, to the voters at large for indorsement, is unreasonable.

19. The validity of a legislative police regulation depends upon whether the ends sought to be attained are appropriate, and the means to such ends are also appropriate.

20. Legislative regulations of the right to vote and rights incidental thereto are appropriate to at least these ends:

(a) To keep the ballot sheet within a reasonably workable compass, both from the standpoint of the party and the individual right;

(b) To promote such party integrity on the only legitimate basis for legal conservation of party existence, as to discourage electors claiming to belong to one organization from invading the primary of another;

(c) To stimulate exercise of the right to participate by voting in public matters.

21. A legislative condition of a person having his name, as that of a party nominee, placed on the official ballot, under his party designation, in a special party column, that he shall have received a sufficient number of votes for such place at the preceding primary to fairly indicate that he is such party's nominee, and that the party has a reasonably significant membership, is in the field of legitimate regulation respecting the suitableness of the ballot, both as regards the major and minor election districts.

22. Some standard of measurement by which to test the competency of a political party to have the use of the official ballot sheet for the purpose of a party ballot follows, necessarily, from the use of the Australian ballot form.

The votes cast in an official district for a party nominee for gov-

4 SUPREME COURT OF WISCONSIN. [Oct.

State ex rel. McGrael v. Phelps, 144 Wis. 1.

ernor, is a proper basis from which to derive a unit of measurement for such party's status at the succeeding primary election, and a number equal to twenty per cent. thereof is a fair unit by which to determine the minimum of party strength in such district, required to be shown at such primary by such party, as to any particular office for such district, to entitle the person favored as the party nominee to have his name placed, as such, in the party column on the official ballot at the succeeding election.

24. The means indicated for regulating the workable size of the ballot sheet applies to minor districts as well as the state at large; treating a political party as having, in a sense, an individuality in each official district separate and apart from that in any other district.

25. The method mentioned for regulating the size of the official ballot sheet, is also a proper means of regulation to prevent participation by members of one party in the contests between candidates at the primary, of another party.

26. Such method is also a legitimate means of stimulating exercise of the elective franchise.

[Syllabus by MARSHALL, J.]

TIMLIN, J., and WINSLOW, C. J., dissent.

BARNES, J., concurs in the conclusion reached.

ACTION invoking the original jurisdiction of this court to compel the board of county canvassers of Milwaukee county to certify the names of the petitioners as those of the regular nominees of the Democratic party in said county, entitled to have their names placed on the official ballot as such for the general election in 1910.

The petition, by appropriate allegations, shows that at the last primary election each petitioner received the greatest number of votes cast thereat for any one to be the Democratic party candidate for the particular county office for which he was a candidate at such primary, but that the aggregate vote of all candidates for such office was not twenty per cent. of the vote of such county for the Democratic candidate for governor at the general election in 1908, and by reason thereof the board of canvassers will not, unless judicially coerced thereto, certify his name for a place on the official ballot as the

candidate of his party for such office at the next general election. The petition further shows, by appropriate allegations, that the Democratic party is a political organization which has existed for many years and, without exception, on all occasions therefor, presented candidates for public offices and proclaimed party principles to be represented by such candidates.

The defendants demurred to the complaint upon the grounds: (1) that this court has no jurisdiction of the subject of the action, and (2) that the complaint does not state facts sufficient to constitute a cause of action.

The cause was argued and submitted on October 8, 1910.

For the relators there was a brief by *Joseph E. Davies*, with *J. E. Dodge* and *John A. Aylward*, of counsel, and oral argument by *Mr. Davies* and *Mr. Aylward*.

For the defendant there was a brief by the *Attorney General* and *Russell Jackson*, deputy attorney general, and oral argument by *Mr. Jackson*.

On October 15, 1910, the court announced its decision (WINSLOW, C. J., and TIMLIN, J., dissenting) sustaining the demurrer and dismissing the complaint. The points decided were stated in a memorandum decision and are included, in substance, in the syllabus by MARSHALL, J., at the head of the case, and are covered by the opinion of the court, *post,* p. 6. Among other propositions the following were thus stated in that memorandum:

"The declaration of rights contained in section 1, article I, of the constitution, is a prohibition by necessary implication of legislation inconsistent therewith.

"The right of suffrage includes the right of voters to separate into groups according to their political beliefs respecting governmental policies, and the right of every group to organize and have all the machinery in that regard not reasonably prohibited by law for making the organization effective as regards declaring the policy of its members, and vitalizing such

policies by electing officers in harmony therewith to legislate and execute law to that end.

"Every legislative interference with freedom on the part of voters to form political organizations and to act under their chosen party names to accomplish the purposes of the organizations is at the same time an interference with the right to vote, so the limit of power as to the one is substantially the limit of power as to the other.

"The office of regulation of the right to vote and the rights incident thereto being to conserve and promote efficiency, any so-called regulation which goes clearly beyond the boundaries of conservation into the field of impairment or destruction, is unreasonable and inhibited by the constitutional guaranty of the rights of suffrage and inhibition of interference with inherent rights."

On October 25th the relators moved for a rehearing, and also moved that Supreme Court Rules 37–41, relating to motions for a rehearing, be suspended. The latter motion was denied; and the motion for a rehearing was afterwards abandoned. .

The following opinion was filed December 14, 1910:

MARSHALL, J. The first ground of demurrer, counsel assume was passed upon on the application for leave to sue in this court. Not so, except so far as to enable the parties to raise all questions by appropriate pleadings. However, no reason occurs to the court why it should not exercise jurisdiction, and, as counsel have not argued the matter, it is passed as usual without more than an incidental notice.

The second ground of demurrer challenges the constitutionality of ch. 477, Laws of 1909, in that it precludes any person from having his name appear on a general election official ballot as a party candidate unless he shall have received at least a plurality of the votes cast for the place at the preceding primary, and unless the aggregate of all his party votes for can-

didates for the office at such primary shall be equal to "twenty per cent. or more of the votes cast for nominee of such party for governor at the last general election."

The law must be considered with reference to the requirement that the form known as the Australian ballot shall be used at an election.

This is the exact language to be examined:

"If all the candidates for nomination for any one office voted for on any party ballot shall receive in the aggregate twenty per cent. or more of the vote cast for nominee of such party for governor at the last general election, the person receiving the greatest number of votes at such primary election as the candidate of such party for such office, shall be the candidate of that party for such office, . . .

"If all the candidates for nomination for any one office voted for on any party ballot shall receive in the aggregate less than twenty per cent. of such votes so cast at such last general election, no person shall be deemed to be the party nominee for such office, but the person receiving the greatest number of votes at such primary as the candidate of such party for the office shall be deemed an independent candidate for such office, and his name shall be placed on the official ballot in the column of individual nomination and he shall be denominated in such column as 'independent.' "

Thus no party can, in a special column, be represented by a candidate for an office at one election, unless, *first,* it shall have had a party candidate for governor at the preceding general election; *second,* it has sufficient members in the election district in question, who have sufficient interest in party integrity to and do poll at the primary for all persons there competing for first place as the party choice for such office to stand as such on the official ballot, equal to twenty per cent. of the political party vote cast for governor at such preceding election.

It is suggested that the words "twenty per cent." as written, point to the total vote in the state, and so make the law entirely unworkable and void. Manifestly, taken literally, the

law would destroy party representation on the official ballot, as to all minor election districts, since it cannot be well supposed but that, in general, the members of any political organization would be less in each such district than twenty per cent. of such party's vote throughout the state. The legislature could not have in mind such an absurdity, yet, there is no way to avoid the result except by judicial construction; that ever-ready and indispensable instrumentality for use in remedying legislative inadvertences and want of appreciation of the importance, in making written law, of speaking with language of unmistakable meaning in the literal sense of words. If it were not for judicial power to give effect to ideas, however obscurely expressed, if yet not so hidden as to be undiscoverable,—in view of the objects designed to be attained, the circumstances dealt with, the consequences of a literal or too literal interpretation, and many other lights that might be mentioned,—and not so out of harmony with the sense of the language used as not to be readable therefrom; giving thereto the widest reasonable scope; supplying all words reasonably suggested as in place by those used; eliminating or changing those clearly improperly used and transposing words or clauses, if necessary from proper to improper locations,— much legislation would fail.

The scope of judicial power of construction is strikingly illustrated in *Neacy v. Milwaukee Co., post,* p. 210, 128 N. W. 1063. A word expressing an idea, very obscurely, considering its location, was expanded by the addition of other words, the whole then transferred to its proper location as a qualifying clause, and another clause was transposed to its proper location, so that the collection of words which, read literally, was senseless, was made to serve the purpose intended.

The construction now required is not difficult. In one view the law does not need construction at all. It is a cardinal principle for reading statutes that words not used, but necessarily implied from those which are used, are as clearly a part

of the act as the written words, and to be so deemed in their appropriate place. Applying that, in view of the manifest purpose of the act before us, the words, *for the particular official district involved,* or similar words, after "for any one office," and the words, *in such district,* or similar words, after "governor," can be readily seen in place.

If the foregoing states the case too strongly in favor of the act, there are other rules which accomplish the same result.

A highly unreasonable purpose; one which would clearly render a legislative enactment void for uncertainty or unconstitutionality, is never to be attributed to the lawmaking power if that can reasonably be avoided. It must be presumed as to a written law that some sensible legal end and some sensible legal means of accomplishing that end were in view. Therefore, regardless of how crude and obscure may be the forms of expression used by the legislature, the court should not tire of searching for its purpose and some sensible way of so translating the legislative language as to express it, without having exhausted all judicial power to that end.

To discover the legislative purpose in an enactment, hidden in obscurity, as has often been said, the court can and should consider the "surrounding circumstances, the existing condition of things, the evils to be remedied, the objects to be attained" (*Clark v. Janesville,* 10 Wis. 136), "look at the whole and every part of the statute and the apparent intention derived from the whole, to its subject matter, to its effects and consequences, and to the reason and spirit, and thus ascertain the true meaning of the legislature." *Harrington v. Smith,* 28 Wis. 43. Having discovered the evident legislative intent, the letter should be sacrificed, within the uttermost boundaries of reason, to effect it. *Haentze v. Howe,* 28 Wis. 293; *State ex rel. Heiden v. Ryan,* 99 Wis. 123, 74 N. W. 544; *Wis. Ind. School v. Clark Co.* 103 Wis. 651, 79 N. W. 422; *Rice v. Ashland Co.* 108 Wis. 189, 84 N. W. 189. To that end a disjunctive may be turned into a conjunctive, *Att'y Gen. v. West*

*Wis. R. Co.* 36 Wis. 466; a clause expressing an idea wholly out of harmony with the purpose may be disregarded and words expressing the real intent substituted, *Palms v. Shawano Co.* 61 Wis. 211, 21 N. W. 77; a material omission may be supplied, *Custin v. Viroqua,* 67 Wis. 314, 30 N. W. 515; and obscure qualifying words, used out of place, may be expanded into a qualifying clause and transposed to the proper place, and other transpositions be made in connection therewith, *Neacy v. Milwaukee Co., supra.* "A thing which is within the intention of the makers of the statute is as much within the statute as if it were within the letter." *U. S. v. Freeman,* 3 How. 556, 565; *School Directors of Pelican v. School Directors of Rock Falls,* 81 Wis. 428, 51 N. W. 871, 52 N. W. 1049. As a correlative: "A thing which is within the letter of the statute is not within the statute unless it be within the intention of the makers." *People ex rel. Att'y Gen. v. Utica Ins. Co.* 15 Johns. 358, 379. That doctrine, in the whole, is found often stated in the books and applied to supply or eliminate or change words, departing widely from literal sense when necessary to effect a manifest intent. *People ex rel. Bussey v. Gaulter,* 149 Ill. 39, 36 N. E. 576.

True, in construction, the boundaries between the judicial and legislative field must not be passed. The letter must not be unreasonably violated. In sacrificing it the court, to reach the intent, must proceed with reason. While it may supply obvious omissions, make transpositions, expand obscure words, reject unnecessary or improperly or inadvertently used words, and view words broadly or narrowly or commonly, according to circumstances, in the ultimate, the law's vitality must be found in it and to have been reasonably placed there by the lawmaking power.

It is so very plain that the legislature did not intend any such absurd and revolutionary result as would follow from giving literal effect to its visible words; did not intend to speak of the gubernatorial vote with reference to the respective election districts,—the words suggested as in place, though not writ-

ten, are at least there by reasonable implication, which amply satisfies the case.

It may be that too much time and space has been given to the subject of construction. But such attention was given thereto in considering the case, that it was thought best to treat the matter with considerable fulness, following in that regard the points decided and promulgated before the writing of this opinion.

We now come to the points urged by counsel. The major proposition and the one dominating the whole, is that the law of 1909 materially impairs the right to vote, and is, therefore, an unconstitutional interference with such right.

In a logical treatment of such major proposition the nature of the right involved may well be considered. Without adequate understanding thereof one can hardly discover and appreciate its constitutional safeguards.

It is often said by judicial and elementary writers that the right to vote is not a natural right; that it is a mere privilege which may be granted or not, or granted upon condition and when granted taken away or modified; all according to the discretion of the lawmaking power, in the absence of express constitutional inhibition to the contrary. Few are found who have ventured to challenge the doctrine that the right to vote is more than a mere legislative privilege, in the absence of a grant in the fundamental law, which may not be strictly correct as it is generally understood.

The idea that the right to vote is no more than a mere privilege was announced early as a justification for legislative interference therewith, and has been unqualifiedly reiterated over and over again and with growing emphasis as such interferences have progressed in severity. Thus it was said by a divided court in *Healey v. Wipf,* 22 S. Dak. 343, 117 N. W. 521:

"The election franchise is not a natural right. It is a privilege which may be taken away by the power that conferred it; and the only limitations upon the power of the legislature

to regulate its exercise and enjoyment are the express limitations found in the federal and state constitutions."

The history of the subject shows that the idea is of foreign origin. It existed here prior to the Revolution under our then borrowed system. It is a relic of the old world systems. Thus it will be seen in *Frieszleben v. Shallcross,* 9 Houst. (Del.) 1, the court reasons from the prevailing ideas and conditions prior to 1776.

The difficulty seems to have been in failing to distinguish between fundamental limitations which the people, in forming a government, may place upon a right and the creation of the right itself. So the idea took root that,—the change from the old to the new system marked by the Declaration of Independence, the basic features of which have been incorporated into every written constitution in this country and in none more significantly than our own,—did not change the nature of those things which had been commonly the subject of unbridled legislative interference, as if they were the mere creatures of sovereign authority. So the idea persisted that the right in question, like the right to inherit and transmit property upon the death of its possessor, was in no sense a natural or inherent right. Such idea has been reiterated over and over again and only been, if at all, doubtingly referred to now and then. The error as to the latter was repudiated by this court in *Nunnemacher v. State,* 129 Wis. 190, 108 N. W. 627. I repeat what I wrote on that occasion, changed to fit the case. Error has often had the most distinguished of supporters. If it were true that error could be sanctified by mere weight of numbers or ability of its advocates, and given the character of infallible truth by the mere force of repetition, then the idea that the right to vote is not a right at all, except in the sense of a creature of law; that it has no inherent quality,—would long ago have taken such deep root that no one, much less a court, would hardly venture to make an effort to dislodge it.

Had the all-pervading concept of the Declaration, which

State ex rel. McGrael v. Phelps, 144 Wis. 1.

marked the change to our system of constitutional liberty, been from the first given the dignity that it commanded and has latterly received, instead of being regarded as in the nature of a rhetorical embellishment, or a sort of apostrophe to something sentimental rather than real, the very ideas which it was designed to entrench as fundamental law would not have been somewhat lost sight of.

Formerly, in general conception, there were no rights, strictly so called. There were privileges which came, directly or indirectly, by grace from sovereign authority. That was the crowning mischief of the Colonial period which was sought to be removed. Hence, at the start, things essential to our welfare which had been enjoyed, so far as enjoyed at all, as privileges, were claimed as inherent rights, only surrenderable by the people, or subject to limitation by them by fundamental law. There the standard was reared of a new era, one of inherent rights, instead of sovereign graces. To emphasize and make that clear it was declared that all men are "endowed with certain inalienable rights," specifying some, but not attempting to specify them all.

The word "inalienable" was, doubtless, not used in the strict sense, because some rights referred to were commonly parted with or modified by consent. Appreciating that, doubtless, in most constitutions, ours included, the term "inherent" was substituted for inalienable, to denote, more accurately, the functional character of rights of members of a community in an unorganized state.

That the right, in the beginning, here to participate in governmental affairs by reasonable exercise of the elective franchise, was inherent, within the meaning of the fundamental declaration in the bill of rights, seems pretty plain. Not inherent in the sense of inalienable and inseparable from the individual. Not natural in one view, but, inherent in the same sense as the right of self-defense and the right to acquire, hold, and transmit property are. Thus, it is conventional in the

State ex rel. McGrael v. Phelps, 144 Wis. 1.

sense other rights are which are in their nature absolute till surrendered or limited by consent, express or implied. It is not natural in the sense that it is so absolute and functional as to be inseparable and not surrenderable. This court has before classed the right to vote as above indicated. *Koerber v. Patek,* 123 Wis. 453, 102 N. W. 40. That was done by way of discussion and illustration, it is true; but done considerately, nevertheless.

The fundamental declaration referred to is the substructure upon which our whole constitutional system is bottomed. It breathes the all-pervading purpose of the whole body of fundamental law. Around and upon it are clustered all other things as subsidiary in a complete structure.

So when we come to sec. 1, art. III, of the constitution,— in form granting the right of suffrage to every male person of the age of twenty-one years or upwards, under specified conditions,—it is to be read, in conformity to the general nature of state constitutions; as a limitation rather than a grant, and a prohibition as to all persons not recognized as falling within the limitation. *Expressio unius est exclusio alterius.* This general idea that the grant, in form, is really a limitation to one class and a prohibition to all others, conventionally agreed to in the formation of the government, has been many times judicially asserted in connection with the idea that the right to vote is not a natural right, but is a conferred right; the real logic of the whole being that, in so far as the right is constitutionally confined to a class, it is a created right; *People v. Pearce,* 27 N. Y. 45; *People v. Baker,* 48 Hun, 198, a right created by the people as a whole, acting fundamentally; exercising the function which is inherent in the people as a whole to limit, at least some rights, in their nature, inherent in the individual, especially that which, for the benefit of the whole, must be subservient to the right of society to conserve and promote the general welfare.

So the right to vote is one reserved by the people to members of a class and as so reserved, guaranteed by the declaration of

rights and by sec. 1, art. III, of the constitution.   It has an element other than that of mere privilege.   It is guaranteed both by the bill of rights; and the exclusive entrustment of voting power, contained in sec. 1, art. III, of the constitution; and by the fundamentally declared purpose of government; and the express and implied inhibitions of class legislation, as well.   Such declared purpose and the declaration of rights, so far as they go, and the equality clauses,—constitute inhibitions of legislative interference by implication, and with quite as much efficiency as would express limitations, as this court has often held.   *State ex rel. Zillmer v. Kreutzberg,* 114 Wis. 530, 90 N. W. 1098; *Koerber v. Patek,* 123 Wis. 453, 469, 102 N. W. 40; *State ex rel. Milwaukee Med. Coll. v. Chittenden,* 127 Wis. 468, 521, 107 N. W. 500; *Nunnemacher v. State,* 129 Wis. 190, 230, 108 N. W. 627; *State v. Redmon,* 134 Wis. 89, 114 N. W. 137.

Thus is given the right to vote a dignity not less than any other of many fundamental rights.   So it has been rightly said by judicial writers, "It is a right which the law protects and enforces as jealously as it does property in chattels or lands. . . . The law maintains and vindicates" it "as vigorously as it does any right of any kind which men may have or enjoy."   *State v. Staten,* 46 Tenn. 233, 241.   It is commonly referred to as a sacred right of the highest character and then again, at times, as a mere privilege, a something of such inferior nature that it may be made "the football of party politics."   We subscribe to the former view, placing the right of suffrage upon the high plane of removal from the field of mere legislative material impairment.   It has been not inaptly characterized in these lines:

"A weapon that comes down as still
    As snowflakes fall upon the sod;
But executes a freeman's will,
    As lightning does the will of God."

Giving to the right to use the elective franchise its proper significance, it is yet subject to regulation like all other rights.

That, inherent therein, exists a right of persons to combine according to their political beliefs, and right, so far as not reasonably prohibited by law, of each group to possess and use freely all the machinery for increasing the power of numbers by acting as a unit—over the power acting individually, to effect a desired political end,—goes without saying. This, and all other courts which have dealt with the matter, have so declared, and recognized that political parties with freedom of action, as broad as freedom of use of the elective franchise, to the end that the public welfare, for which governments exist may be best promoted,—are essential to our form thereof. This court, in spirit at least, fully indorsed in *State ex rel. Van Alstine v. Frear,* 142 Wis. 320, 125 N. W. 961, this declaration of the supreme court of California:

"No one can be so ignorant as not to appreciate the value, indeed the necessity, of opposing political parties in a government such as ours. . . . No statement is needed in the declaration of rights to the effect that electors holding certain political principles in common may freely assemble, organize themselves into a political party, and use all legitimate means to carry their principles of government into active operation through the suffrages of their fellows. Such a right is fundamental. It is inherent in the very form and substance of our government, and needs no expression in its constitution." *Britton v. Board of Elec. Comm'rs,* 129 Cal. 337, 61 Pac. 1115.

The rights involved, however, said the court in effect, are within the constitutional guarantees, state and national. "Self-preservation is the right of political parties as well as individuals." Freedom to do those things reasonably appropriate to the effectual maintenance of party organizations; and use thereof to accomplish legitimate party ends,—cannot be abridged any more than can the right to vote. The limit of legitimate interference, as to the latter, is necessarily the limit as to the other, so far as the question of power is concerned.

There is nothing contrary to the foregoing in *State ex rel. Runge v. Anderson,* 100 Wis. 523, 76 N. W. 482. True, the court there said that the thing guaranteed by the constitution is the individual right to the individual choice, by vote. "Mere party fealty and party sentiment, which influences men to desire to be known as members of a particular organization, are not the subjects of constitutional care. It deals with the individual right to vote. . . . If that be not impaired and reasonable opportunity be furnished for equal representation on the official ballot," that is sufficient. In using that language the court was addressing itself to the situation in hand. One where opportunity was afforded for full efficiency of party organization and party representation upon the official ballot so far as principles were concerned. The idea was, whether the legitimate purpose of party organization being fully satisfied, the full right being accorded, which we affirm now is incidental to the right to vote, does the latter right have the further incident of inviolability, because of some constitutional limitation upon legislative power, or mere party sentiment, so that after enjoying the right of one party characterization upon the official ballot, indicating adherence to some distinguishing political policy, a person may, as matter of constitutional right, and because of association for mere sentimental or selfish reasons, demand a second such characterization by another body, to gain favor, regardless of the legitimate purposes of party organization; that of promoting and vitalizing policies, rather than individual selfishness. True, as held in the *Runge Case,* only such interference with the right to use of the official ballot for party purposes as invades, destructively, opportunity to use the elective franchise to further legitimate ends of party existence, are within the inhibitions of the right to vote.

It has become elementary that constitutional inhibitions of legislative interference with a right, including the right to vote and rights incidental thereto, leaves, yet, a field of legis-

lative activity in respect thereto circumscribed by the police power. That activity appertains to conservation, prevention of abuse, and promotion of efficiency. Therefore, as in all other fields of police regulation, it does not extend beyond what is reasonable. Regulation which impairs or destroys rather than preserves and promotes, is within condemnation of constitutional guarantees. So it follows that, if the law in question trespasses upon the forbidden field, it is only law in form.

It is further elementary that, the extent to which the legislature may go in the field of police power, is primarily a matter for its judgment. As to the case in hand, the same as others, it could not properly go beyond reasonable regulation. However, what is and what is not reasonable, is primarily for legislative judgment, subject to judicial review. Such review does not have to do with expediency. It only deals with whether the interference, from the standpoint of a legitimate purpose, can stand the test of reasonableness, all fair doubts being resolved in favor of the proper exercise of lawmaking power.

In the exercise of police power two questions are involved. *First.* Is the purpose legitimate? *Second.* Are the means employed to effect the purpose legitimate? If the former be legitimate and the latter reasonably adapted to effect the former, the law is entitled to judicial approval, otherwise not.

The first essential mentioned is wholly within the judicial field. That is, whether a legislative effort has relation to a proper subject of police authority, the court must decide. True, such a degree of care to avoid unduly putting up a barrier to the exercise of lawmaking power, is to be used, as not to raise the standard of constitutional prohibition in any doubtful case. The second essential, as suggested before, is particularly legislative discretion. So the range of methods of interference is necessarily as broad as the uttermost boundaries of reason. Abuse of discretion so clear in the field of fact as

not to be fairly justifiable, is necessary before the legislative action can be condemned as usurpation. That has been so often treated in this court as to be deemed elementary.

The foregoing leads up to the question, peculiarly, as said, within the judicial field, viz.: Was the purpose of the act in question legitimate?

It was not supposed that there was doubt but what party representation upon the official ballot is a proper subject of police regulation. Granted, as we do, that the right of such representation exists and that it is within constitutional guarantees as necessarily incident to the right to vote, it was thought that the incidental matter, as well as the primary one, was not independent of reasonable legislative control. Counsel for plaintiff do not seem to insist to the contrary; contenting themselves with contending that the manner of regulation is destructive. But, it has nevertheless been suggested that the right of regulation does not extend to discriminating between political organizations in respect to their use of the ballot, according to significance in membership; especially so far as to make the party vote at one election for a particular candidate a standard by which to measure sufficiency of party membership, as evidenced by the showing at the succeeding primary,—to entitle the favored party candidates at such primary to party location upon the official ballot at the succeeding election; thus affording party use of the ballot to some organizations with the obvious advantage of facilities for team work and denying it to others. The idea is that a party organization, however small, representing principles fairly differentiating it from others, is entitled, as matter of constitutional right, to equality with any other, however large, as regards use of a party ballot.

The idea suggested, should it prevail, would, in all circumstances, nullify any legislation affording a different use of the ballot to some political organizations than to others. It is a radical proposition which has not been passed without consid-

eration.   It is by no means without merit.   It is difficult to
escape the conclusion, if it can be done at all, that the right to
vote, being, as has been said, as sacred as any other right,—
and in some respects more so, since the safety of the latter is
dependable upon the former,—its free and efficient exercise by
party combinations should no more depend upon the signifi-
cance of the latter as to membership, so long as it has a sub-
stantial good-faith existence, than should property rights de-
pend upon station or wealth; that the absolute equality which
is equity should apply to parties as well as individuals in the
ordinary relations of life.

That doctrine is not without its attractiveness.   It makes a
strong and disturbing appeal to the conscience and the reason
of the writer and his ideals of a people's government of their
own creation as enshrined in our constitutional system.   The
standard of fundamental liberty and equality which I believe
to have been planted in such system, as to the time-honored
method of promoting and vitalizing cherished governmental
policies by party organizations, and party efforts, and party
methods of party representation upon party ballots, I would
not voluntarily lower any more than I would consciously vio-
late my oath of office.   Whether legislation has not in some
cases, and whether it has not in this case, endangered, if not
lowered that standard, admits of doubt.   I say this for my-
self alone.

In considering the question of whether there may properly
be limitations of some sort to party enjoyment of a party bal-
lot, we must face the fact at the outset, that the use of an offi-
cial ballot, the so-called Australian form, containing all par-
ties as well as individual or independent appeals to the favor
of voters,—has been generally recognized as fundamentally
right.   The contrary is not claimed by counsel for plaintiff
and is not claimed, as I understand it, by any member of the
court who disagrees with the majority.   On the question of
whether ballot reform did not go too far in preventing politi-

cal parties from having the benefit of a separate party ballot, I have never been free from doubt. · However, at this late day, after compulsory use of the Australian form has been approved or submitted to as proper in nearly every, if not every, state of the Union, it is too late to suggest, with confidence, to the contrary. Such an invasion of the free use of the ballot as enjoyed at the time our state constitution and most state constitutions were adopted, was a most radical departure from the custom of the country, which had existed for about a century. That it was adopted in the foreign country of its origin, and has been substantially in like countries, having no written constitution, is easily understood. How it came to be so easily entrenched in the system of this country, with its manifest interference with political liberty, is not so easily understood. But we are face to face with a condition which has so strongly stamped the prevailing ballot system as proper, that it is too late to question it. Universal practical construction and usage sanctions it, and most states, including our own, have judicially, expressly or impliedly, done the same.

In view of the foregoing it has commonly been thought that some test of party capacity, having reference to numbers, for representation on the official ballot is necessary. Otherwise the number of parties and names of candidates might be so great as to render the single ballot sheet unsuitable for exercise of the constitutional right to vote. As we understand it, counsel for plaintiff concede this and cite cases to that end. Nevertheless we are led not to pass over the subject without attention, because of questions raised here. This branch of the case, it seems, is not open to fair controversy, if we may properly consider the door closed by decisions elsewhere. In *State ex rel. Hagendorf v. Blaisdell* (N. Dak.) 127 N. W. 720, it was very recently decided that a legislature may, within reasonable limits, determine how many voters, acting together for the purpose of making nominations, shall be entitled to a party ballot. The court reasoned that otherwise

any number, however small, could organize a party and demand use of the recognized equivalent on the official sheet of a single party ballot, thereby rendering it probable that parties would often be so numerous as to necessitate a sheet so extensive and complicated as to render it practically unintelligible and confusing and on that account, destructive of the right to vote itself, instead of simplifying and regulating it. That seems quite plain from a practical standpoint. If there be any infirmity therein, it strikes at the idea, itself, of the combination official ballot. The reasoning of the North Dakota court voices the common judicial thought. We refer to it, specially, because of its being the most recent contribution. Statutes and decisions elsewhere, so numerous that we will not venture to cite them, are to the same effect. In no case, so far as we can discover, has the principle been condemned. The regulation has often been challenged on account of its being excessive, but, as a rule, unsuccessfully.

It follows, logically, that the legitimacy of legislative regulation, in the field under discussion, must be tested with reference to appropriateness of ends sought to be attained and also of means to such ends. We would not venture to suggest all the ruling ideas which the legislature indulged in, but several, it is thought, are quite plainly apparent, including the one already suggested, and as regards minor districts as well as the state at large, as we will argue a little later on.

Looking at "the surrounding circumstances," the "existing condition of things," "the evils to be remedied" or prevented, "the objects to be attained," the history of the particular subject, the recognized importance to the public welfare of opposing political parties representing differing governmental policies with such high degree of fidelity of membership to principles as to incline them to promote principles rather than mere personal ends, and of electors intelligently and conscientiously using their valuable constitutional right as well as possessing it; these three purposes stand out in bold and unmis-

takable significance: *first,* to keep the ballot within a reasonably workable compass, both from the standpoint of the party and of the individual; *second,* to promote such party integrity on the only legitimate basis for legal conservation of party existence, as to discourage electors, claiming to belong to one organization, from invading the primary of another; *third,* to stimulate exercise of the right to participate by voting in the activities of the social state.    We will treat each subject, giving primary importance to the first.

That a legislative minimum of political significance to entitle a party to a special place on the official ballot, is necessary to keep, so far as practicable, the ballot sheet within a workable size, as before suggested, seems not to need vindication by argument.    Conceding that, then, clearly, such minimum should not be so large nor of such character as to unreasonably prevent the formation of new parties, or necessarily tend to afford one of substantial character, as to numbers, less opportunity for efficient existence or competition for the favor of voters at large, than any other, however large, by reason of inequality of capacity to use a party ballot.    Such inequality of right, as we have seen, would, of itself, be a fatal interference with fundamental rights.    Likewise would such interference with reference to relative significance as to materially impair the essentials of equality of opportunity; so long as it operated to exclude the smallest party of substantial membership and significance from enjoying the party ballot, or the smallest group of electors, rightly regardable as of substantial significance as to numbers, from forming and efficiently maintaining a party organization, and to that end competing for public favor by party candidates presented on a party ballot, as by having its special party column on the official ballot sheet.    All that is contended for on behalf of plaintiffs.    The principle itself meets with our unqualified approval.    Citations in support thereof from other jurisdictions are unnecessary.    We deem it to be elementary.    Any

suggestion to the contrary in other jurisdictions would not influence this court to invade it.

Assuming, for the time being, that restrictions upon the liberty of party candidates for office for the respective election districts voted for at the primary to have their names placed on the official ballot, fairly and substantially, promote restriction of the general election ballot sheet, to a reasonable compass, which was doubtless the legislative idea,—is the minimum of representative party significance, written into the law of 1909, excessive?

How large the membership of a political party organization should necessarily be, as regards a particular election district, in order to be fairly regarded as substantial, and how long such organization should at least have existed before it can fairly be regarded as having substantial existence as to the respective election districts; are questions of much difficulty. For that reason the range of legislative discretion is necessarily large; and the boundary between the unreasonable and the beyond room for fair doubt, and the extent of the region of mere doubtful; is not easy to discover.

In the judgment of the writer, the somewhat neutral ground in this instance was invaded by the legislature. In the extreme to which the act goes, the lawmaking power traveled beyond the line of danger. Whether they did not even traverse the region thereof and beyond into the field of fatal impairment of sacred rights, I do not consider free from difficulty.

The law, as we have seen, makes an aggregate of votes cast at a primary for all candidates for a particular office in a particular election district, equal or more than twenty per cent. of the total votes cast in such district for the party's nominee for governor at the preceding general election,—the standard by which to test substantial party status. It assumes that if party fealty does not so persist, or exist, as to efficiently move an elector in any district to record his vote at his primary, he should not be counted in determining such status. Is that

manifestly unreasonable? It is to be noted that the percentage, taken as a standard for comparison in a district, is not the total vote formerly there cast for governor; only the vote cast for the party nominee, whether successful or not. That, in general, would be a very small percentage of the total vote. If a party cannot thus show the existence of at least one fifth of its former significance, should it be regarded, beyond reasonable doubt, to still have substantial existence? That is the question.

Some standard of comparison is certainly necessary. That is the logic of every situation to be measured. As principles are not supposed to spring up or pass out of existence suddenly, or, in general, to be momentarily the basis of worthwhile political organizations, but to yield slowly to new conditions having naturally a considerable period of development into recognizable materiality, and applying differently, but changing slowly in that regard, to changing importance of old conditions; a party vote in the state at large would seem not to be an unfair point of view from which to view the field, and the party vote for the office most likely to indicate the maximum of party members not to be unfair as a basis from which to determine the unit of measurement. Can the party membership, so far as represented by its candidate for any particular office in an official district, fall below one fifth of such maximum and still be said to persist as a substantial organization of such significance as to numbers, as regards such district?

If the questions suggested were to depend on the general trend of analogous legislation and judicial approval elsewhere, they would have to be resolved in favor of the law before us. In *State ex rel. Hagendorf v. Blaisdell* (N. Dak.) 127 N. W. 720, a numerical test to entitle an organization to a party ballot and name party candidates, equal to five per cent. of the total vote for all candidates for governor at the previous general election, was held reasonable. Prior thereto,

in *State ex rel. Montgomery v. Anderson* (N. Dak.) 118 N. W. 22, a law requiring a party's votes at a primary for any election district for all its candidates at such primary for one office, for such election district, equal to thirty per cent. of the same party's vote therein for a specified minor state office, as an essential to such party having a candidate for such office on the official ballot at the succeeding general election,—was sanctioned by a divided court. Since rendering the first decision cited, the same court, by a bare majority of justices, as we understand, in a case not yet reported,—overruled the first case cited. The position of the court may well be considered as not yet having been very firmly established.

In *DeWalt v. Bartley,* 146 Pa. St. 529, 24 Atl. 185, a law requiring a party, in order to have party representation on the official ballot, to have polled ten per cent. of the total vote at the last general election, was sustained. It was said that some such regulation was absolutely necessary, as an accompaniment to the law requiring use of the Australian form of ballot; that the right to vote is an individual right; that the right to nominate is primarily a party right, and necessarily requires, in order to have substantial significance, that there should also be a party of significance, otherwise a few persons could assume to be a party and successfully demand use of a party ballot,—as the Three Tailors of Tooley Street assumed to be the "People of England,"—resulting in the scheme of an official ballot being a failure "as the ballot would become the size of a blanket."

In *Miner v. Olin,* 159 Mass. 487, 34 N. E. 721, a similar law was sustained by the process of reasoning indulged in by the Pennsylvania court.

In *State ex rel. Fitz v. Jensen,* 86 Minn, 19, 89 N. W. 1126, a law was sanctioned requiring a political party to poll ten per cent. of the total vote, at one general election, in order to have a party place for its candidates on the official ballot at the succeeding general election.

We might continue at length citing foreign statutes and de-
cisions sustaining legislation, similar, as we think, to the law
in question.   In most of them, it is true, the regulation evi-
denced is of a milder type than that in the law under consider-
ation.   In all, constitutional limitation of such interference
is conceded.   In only the one case cited has a law somewhat
similar to ours been condemned as to the particular feature
now vital.   We have endeavored to examine all such laws and
the adjudications with reference thereto, with the result that,
in every instance of a regulation of the nature of the one in
question, it was recognized as not only proper but necessary.
No act elsewhere is precisely like ours, or near enough thereto
to furnish a precedent, except as to principle.   In that re-
spect the acts and adjudications speak harmoniously in sup-
port of the regulation.

So it will be seen that precedents are wanting as to the pre-
cise question under discussion.   Really, precedents could not
well be helpfully controlling under the circumstances.   The
question must be decided on principles applied to the pecul-
iarities of our own law.   In that respect we are unable to con-
clude either that the basis for measuring party significance at
the election preceding the primary, or the basis for measuring
its significance *in præsenti,* is so manifestly destructive of
party integrity and individual rights to efficiently participate
in collective political effort, as to be fatal to validity.   Here
again I feel constrained to record my judgment that the legis-
lature traveled upon dangerous ground in going as far as it
did.

We cannot doubt but what the particular feature of the law
under discussion was thought by the legislature to be means
of promoting reasonable restriction of the size and complica-
tions of the ballot sheet.   It may well be thought that such
idea was the dominant one.   It has been suggested that it was
such; that it is illegitimate because it will not promote the end
in view at all; as does a law providing that a political party

shall not be entitled to a party ballot place on the official elec-
tion ballot sheet at any election unless it polled at the previous
general election a specified percentage of the total of votes.
Therefore the latter situation and the statutes and decisions
in that regard to which we have referred, are said not to have
any analogy to the situation we are dealing with.

The position last indicated is not so free from difficulty that
we can well pass it without serious attention.    From the view-
point of party solidarity for the state, only, one may reason-
ably come to the conclusion suggested.    But we must face the
condition the legislature had to deal with.    A condition re-
specting political parties, not so important from the stand-
point of minor official districts, as from that of the major
thing; the state as a whole, yet one which could not be abol-
ished by the legislature.

The condition above referred to is that, in general, a politi-
cal party is made up of units down to those severally compos-
ing the smallest official district each of which, while forming
part of a state-wide organization, has an individuality of its
own.    A political party of the state, as a rule, means a like
party for each congressional, senatorial, and assembly district,
and for each county, town, city, and village.    Whether these
minor individualities, for mere local purpose, though having
very much less of the importance, or, generally, none thereof,
which make state and national parties proper subjects of legal
protection, in that the latter only have to do with shaping of
public policies; might well be a very fruitful source of ex-
panding the official ballot sheet beyond all reason,—the legis-
lature undoubtedly thought so.    It would not be our province
to condemn its judgment in that regard unless it appeared to
be manifestly wrong.    But on this, with due deference to the
views of those who think to the contrary, we do not regard it
as involved in the region of doubt.

A regulation restricting use of a party place on the official
ballot to the local party unit, according to whether the organ-
ization, locally, has a legislative minimum of significance,

.15]            AUGUST TERM, 1910.            29·

State ex rel. McGrael v. Phelps, 144 Wis. 1.

tested by the showing at the last previous election, regardless
of whether the major party for the major purpose has the req-
uisite status for recognition or not; is not, by any means, un-
known. *People ex rel. Dickerson v. Williamson,* 185 Ill.
106, 56 N. E. 1127.

It must be remembered that party existence does not cease
merely because the party at a particular primary election does
not cast votes enough to elect a candidate with competency to
have his name placed on the official ballot at the succeeding
election, as its duly elected candidate for governor. The way
is still open to the party to secure a place for its candidate
with his party designation, and if he receives, at the election,.
one per cent. of the largest vote for his party for presidential
elector at the last preceding presidential election, that will
give the party the requisite status to compete at the next pri-
mary for a party place on the succeeding election official ballot.
Thus it will be seen, representation on an official ballot at one
general election by a party column filled with party candidates,.
is not necessary to continued party existence. The law pro-
vides that "Any political organization which at the last preced-
ing general election was represented on the official ballot by
either regular party candidates or by individual nominees.
only," may have recognition as a party on the official ballot at
the next primary in any district—where "any of its candidates
or individual nominees received one per cent. of the total vote
cast at the last preceding general election"—by complying with
the ordinary conditions. Ch. 451, Laws of 1903. This we
may say, in passing, is a fairly good answer to the suggestion
that there is no way of forming a new political party under the
present system. It will be seen that not only is there a way
for the creation of party status without pre-party representa-
tion in a special column on the official ballot, but a way by
which a very small showing of strength at one election will
create capacity to compete for all the advantages of a party
ballot at the next primary and the next general election.

If the disposition thus made of what seems to have been the

dominant idea of the legislature and the supposed effective answer thereto were not sufficient to hold the balance in favor of the law, the second purpose we have suggested adds weight thereto.   We must view that in the light of the fact that the primary election was designed to be, so far as the party is concerned, an election of candidates, something more than a mere unofficial naming of candidates as under the convention and caucus system.   The result of the election, as regards the party, is to give the favored persons *quasi*-official status. *State ex rel. Rinder v. Goff,* 129 Wis. 668, 109 N. W. 628. The law, by use of the term "election" as well as the whole framework and purpose of it, indicates, unmistakably, that it was designed to give greater dignity to the result than formerly; to give the election of candidates a somewhat controlling effect upon the final choice of public servants.   Such is the logic of *State ex rel. Rinder v. Goff, supra.*   It is at the primary more than at the election, under our system evolved from the practice of a century commencing with the caucus and convention system in the most primitive form; that the policy of the government is determined upon, as well as the instrumentalities which shall vitalize it.   So, as has been said by many judicial and other writers, political parties have become so potent "in determining the measures and in administering the affairs of government that they are regarded as inseparable from, if not essential to, a republican form of government." *Ledgerwood v. Pitts,* 122 Tenn. 570, 593, 125 S. W. 1036. It is in the hands of parties that the determination and the administration of policies has drifted, as naturally as the delicately suspended and balanced needle turns to the pole.   It is in such hands that such power will rest by the very logic of our social state.   Idealistic efforts to change this may momentarily disturb the equilibrium of natural conditions, as a stone cast into the placid pool disturbs its surface; but as certainly in the one case as in the other, the disturbing cause will sink out of sight and things will resume their natural state.

The legislature and all legislatures which have dealt with this subject, have viewed it on that plane and, from such point of sight, appreciated the importance of party integrity and purity to the public welfare, and, to that end, of making, as part of the regulating machinery, some efficient provision for each person voting a party ticket at a primary making a party choice at that time, or there evidencing good-faith affiliation with the party he then assumes to be a member of. Legislation of that kind of a more or less severe character has been sustained on many occasions. *Ledgerwood v. Pitts*, 122 Tenn. 570, 594, 125 S. W. 1036; *State ex rel. Labauve v. Michel*, 121 La. 374, 46 South. 430; *Morrow v. Wipf*, 22 S. Dak. 146, 115 N. W. 1121.

One of the most significant cases of condemnation of a primary election law as unconstitutional, was because of its not providing safeguards against members of one party invading the primaries of the other. *Britton v. Board of Election Commissioners*, 129 Cal. 337, 61 Pac. 1115, 51 L. R. A. 115. With our common knowledge of the intensity of interest which members of a party take in maintaining its importance before the people, it is not difficult to see that the menace of not having the party ticket on the official ballot, in the absence of a specified showing of strength made at the primary, would naturally be very forceful in preventing them from violating their party faith for the time being, quite as efficiently to the desired end, if not more so, than many of the regulations to such end found in the various statutes on the subject. It may be that this particular purpose, itself, might be a sufficient reason for not condemning the law as manifestly unfair.

The third minor province of the regulation law; that of stimulating exercise of the elective franchise at the primary, is entitled to much weight. This again might, itself, be sufficient to at least place the validity of the law in the realms of doubt and save it from judicial disapproval.

The trend of constructive thought is in the direction of stim-

ulating use of the elective franchise. Inherent in possession of the right, with its constitutional guarantees, is the duty to exercise it. The public welfare requires performance of that duty. Penalties or advantages to secure such performance have been suggested. What more practicable stimulus to individual effort, after passing menace of pecuniary loss or deprivation of rights, than danger of loss of local party status as regards the official ballot. What more efficient aid in stimulating individuals to perform their duty to vote than organized efforts of the political parties to preserve their effective existence. "Self-preservation is the first law of nature." That maxim applies as well to political parties as individuals.

So we need not, necessarily, rest the law upon the legitimacy and sufficiency of what may have been the dominant legislative reason for it. Lay that aside, if we may, though we think we cannot, yet, we cannot condemn the law within the rules governing the subject. Taking the three reasons discussed, and it is not unreasonable to suppose there may have been others, in legislative contemplation, we can well say that the extreme of legislative discretion was not overstepped.

All objections to the law suggested by counsel or in our consultations we have endeavored to treat. The idea that the purpose of the law was not regulative, but was to destroy minority parties, retard or prevent formation of new parties, and promote the supremacy of the one in power *in præsenti,* has not passed without notice. True, no law should be spread upon the statute books by the force of one party because of its happening to be for the time being in control, having the semblance, from any fair viewpoint, of perpetuating its supremacy, or materially interfering with the good-faith organization and efficient existence of any other party composed of a substantial number of citizens, or which will necessarily or materially have that effect. If the ostensible purpose of the law of 1909 were manifestly not its real purpose, it would emphatically meet with judicial disapproval. In case of serious

doubt as to whether a regulation is excessive,—as I think there is here,—manifested by history of administration of it, though I do not entertain doubt but what the law was conceived in good intentions,—notwithstanding the court cannot supply a remedy, because of there being at least a reasonable doubt in favor of enacting it,—should have the attention of the department of government which can supply one.

This does not need to be closed by a formal order for judgment sustaining the demurrer and dismissing the complaint as such order was made following an announcement of points decided in advance of the preparation of this opinion.

The following opinion, entitled both in the case of *State ex rel. McGrael v. Phelps* and in that of *State ex rel. Hanna v. Frear* (see *post,* p. 58), was filed December 14, 1910:

TIMLIN, J. (*dissenting*). These are two actions commenced in this court under the original jurisdiction thereof to require the names of relators to be placed in the Democratic party column upon the official ballot at the ensuing election, notwithstanding the requirements of ch. 477, Laws of 1909, alleged to be unconstitutional. One of the actions is for a writ of *mandamus* against the secretary of state, the other against the county clerk and the board of canvassers of Milwaukee county. They may be considered together.

I readily agree with the majority of the court that—

"The declaration of rights contained in sec. 1, art. I, of the constitution is a prohibition, by necessary implication, of legislation inconsistent therewith."

"The right of suffrage includes the right of voters to separate into groups according to their political beliefs respecting governmental policies, and the right of every group to organize and have all the machinery in that regard not reasonably prohibited by law for making the organization effective as regards declaring the policy of its members, and vitalizing such policies by electing officers in harmony therewith to legislate and execute law to that end."

State ex rel. McGrael v. Phelps, 144 Wis. 1.

"Every legislative interference with freedom on the part of voters to form political organizations and to act under their chosen party names to accomplish the purposes of the organizations, is at the same time an interference with the right to vote, so the limit of [legislative] power as to the one is substantially the limit of [such] power as to the other."

"The office of regulation of the right to vote and the rights incident thereto being to conserve and promote efficiency, any so-called regulation which goes clearly beyond the boundaries of conservation into the field of impairment or destruction, is unreasonable and inhibited by the constitutional guaranty of the rights of suffrage and [the] inhibition of interference with inherent rights."

If the decision of the court were in conformity with these declamatory statements there would be no occasion for this dissent. The actual disposition of the case, however, tends to subvert rather than protect these rights. I am not one of those who believe that the perpetuity or solidarity of any particular political party is essential to free or beneficent government. At the same time a political organization in which electors of common political belief mass themselves in favor of or against some man or measure is in a populous republic necessary to the full and effective exercise of political power by the people. In this sense "party" is desirable and necessary. It is only in the crudest form of representative republican government that the electors vote merely for men. It is only the most ignorant and undesirable vote that is given merely from motives of personal loyalty to a chief. The way of progress is in the direction of voting for or against measures rather than men. In the great enlightened countries of the world this is accomplished by the institution of a responsible ministry representing the political party in power. This ministry proposes legislation, and the legislators in voting thereon pass quite freely from one party to the other according to their views on the proposed measure. If the differences are serious and the party in power is defeated the parliament is dissolved and the parties go to their constituents upon the merits of the proposed law. This law is thoroughly discussed by the candi-

dates, in the press, and by and with the electors, and votes for these candidates are given or withheld on the merits or demerits of the proposed law. This presents a sort of referendum which can only take place in respect of measures serious and far-reaching enough to divide the party in power, and is the outgrowth of experience and admirably adapted to that purpose. Our American system is different. But the same tendency to vote for measures or principles, although somewhat less effective, is apparent here in the construction and promulgation of platforms by the political parties. When platform declarations came to be considered less binding, this tendency manifested itself in the doubtful expedient of the executive assuming the role of premier of his party and negotiating, inducing, and compelling legislation by an exercise of executive power conferred upon him for an entirely different purpose. It also manifests itself in the great and widespread demand for the referendum and recall. This incident of effective exercise of the right of suffrage consists of combination among voters and the selection of candidates pledged to a particular governmental policy or measure. To deprive some part or fraction of the electorate of this power is to encroach upon and seriously impair and even to destroy the voter's right to make his vote effective by such association with others of the same political belief in favor of those men whose adherence or loyalty to the measures in question is known or stated in party platforms or otherwise. To allow one party of the electors to make their votes thus effective and deny this right to another because the latter party is small is to create a condition of political inequality. This condition cannot be lawfully created except from necessity and in cases where the political group is so small as to be negligible. The power of the legislature to adopt reasonable regulation of the exercise of the right of suffrage is not questioned, but:

"All regulations of the elective franchise, however, must be reasonable, uniform, and impartial; they must not have for their purpose directly or indirectly to deny or abridge the con-

stitutional right of citizens to vote, or unnecessarily to impede its exercise; if they do, they must be declared void." Cooley, Const. Lim. (7th ed.) 907, 908.

Does the legislation in question unnecessarily impair the exercise of the elective franchise on the part of any voter? In order to examine this question we cannot confine ourselves solely to the act of 1909, because the effect of that statute as impairing the efficient exercise of the right to vote is accentuated by other statutory requirements.

First, in order that a candidate for office have his name placed on the official ballot in the nominating or primary election he must file with the secretary of state or county clerk, as the case may be, a nomination paper in a prescribed form and signed within a stated time; if he is a candidate for a state office, by at least one per cent. of the voters of the party of such candidate in at least each of six counties in the state and in the aggregate not less than one per cent. nor more than ten per cent. of the total vote of his party in the state; if for a representative in Congress, by at least two per cent. of the voters of his party in each of at least one half the counties of the Congressional district and in the aggregate not less than two per cent. nor more than ten per cent. of the total vote of his party in such district; if for an office representing less than a Congressional district in area or a county office, by at least three per cent. of the party vote in at least one sixth of the election precincts of such district and in the aggregate not less than three per cent. nor more than ten per cent. of the total vote of his party in such district. These percentages are to be computed upon the party vote for the presidential elector receiving the largest vote at the last preceding presidential election. The nomination paper is required to contain a declaration on the part of each signer that he intends to support the candidate named therein. After these nomination papers are filed, notice of the primary or nominating election is given and an official ballot is printed at public expense for use in

such primary election, with the names of all candidates for whom party nomination papers have been filed printed therein. No other ballot is permitted. The form of ballot is provided for by statute, and although spoken of in the statutes as the "ballot," it consists of several tickets, one for each political party with the name of that party at the head. These are all fastened together. The words of this statute should, perhaps, be here quoted:

"At all primaries there shall be an Australian ballot made up of the several party tickets herein provided for, all of which shall be securely fastened together at the top and folded, provided there shall be as many separate tickets as there are parties entitled to participate in said primary election." Subd. 3, sec. 11—12, Stats. (Supp. 1906: Laws of 1903, ch. 451).

There is no ticket for a new organization which cast no votes in the county or precinct for presidential electors at the last presidential election, neither is there any ticket for an existing party which had no presidential nominee and which has polled no such vote at the last presidential election, or which had such candidate but polled no vote for presidential electors in the county or district. The elector is handed this ballot consisting of several tickets, and he selects one of the party for whose nominees he intends to vote and returns the others to the inspectors. The elector must vote this ticket or not at all, except that he may write in a name instead of the printed name; but if he should in doing so insert the name of one who is a candidate for the same office on another party ticket, his vote would be counted for such person only as a nominee of the party on whose ticket it was written. Superadded to these stringent requirements is ch. 477, Laws of 1909, which provides:

"1. If all candidates for nomination for any one office voted for on any party ballot *shall receive in the aggregate twenty per cent. or more of the vote cast for nominee of such party for governor at the last general election,* the person re-

ceiving the greatest number of votes at such primary election as the candidate of such party for such office, shall be the candidate of that party for such office, and his name as such candidate shall be placed on the official ballot at the following election." Subd. 1, sec. 11—18, Stats.

"2. If all the candidates for nomination for any one office voted for on any party ballot *shall receive in the aggregate less than twenty per cent. of such votes so cast at such last general election,* no person shall be deemed to be the party nominee for such office, but the person receiving the greatest number of votes at such primary as the candidate of such party for the office shall be deemed an independent candidate for such office, and his name shall be placed on the official ballot in the column of individual nominations and he shall be denominated in such column as 'independent.'" Subd. 2, sec. 11—18, Stats.

The ballot last referred to in subd. 2 above is the official ballot required to be used at the general election which follows the primary or nominating election. Individual nominations may be made by nomination papers signed and filed by a prescribed percentage of the electors, but this is aside from the primary election, and no political party as a party can make such individual nominations. The form of the official ballot to be used at the ensuing general election is also provided for, and no other can be used. This contains as many party columns as there are political parties receiving the requisite number of votes at the nominating or primary election and also a column for independent candidates. The elector may at the general election vote the whole party ticket by making one cross at the head of the column, or he may make a cross or mark after such names on the ticket as he wishes to vote for, and he may in this way vote for part of the candidates of one political party and part of another. But no pasters are allowed on the ticket or counted as votes. The names of persons nominated otherwise than at the primary election are to be placed in one or more columns designated "independent." But these must necessarily be voted for sep-

arately. They represent on the ticket no common principle or policy: one may be a socialist, one a prohibitionist, one a mere independent office seeker, and so on.

Before considering in detail the defects of the statute in question (ch. 477, Laws of 1909), it is well to consider the foundation precedents and the reasons given for supporting the constitutionality of the laws first above referred to requiring the percentage of the vote there stated in order to obtain a place upon the official ballot.

In *DeWalt v. Bartley*, 146 Pa. St. 529, 24 Atl. 185, 15 L. R. A. 771, a requirement of three per cent. of the entire party vote cast in order to entitle the nominees of that party to a place on the official ballot was upheld. It was said:

"The use of official ballots renders it absolutely necessary to make some regulations in regard to nominations, in order to ascertain what names shall be printed on the ballots. . . . It follows, if an official ballot is to be used, nominations must be regulated in some way; otherwise the scheme would be impracticable, and the official ballot become the size of a blanket."

In *Ransom v. Black*, 54 N. J. Law, 446, 24 Atl. 489, 1021, 16 L. R. A. 769, justifying a similar requirement of five per centum, it was said:

"Now, the plan of providing official ballots, which plan is the keystone of the secret ballot system, involves necessarily some limitation upon the number of party tickets and the number of party candidates. . . . If it was left in the power of each voter, or each coterie of three voters, to adopt a party name and demand that an official ballot should be printed at public expense, and distributed to each voter at the polls, the polls would probably be littered with ballots 'thick as autumnal leaves that strew the brooks in Vallombrosa.' Great expense, labor, and inconvenience would result, without any appreciable benefit to the voter or to society. These regulations may not be the wisest that could have been adopted, still they are regulations which do not seriously impair the right of any citizen to vote. They are intended to restrict the number of

40    SUPREME COURT OF WISCONSIN.    [Oct.

State ex rel. McGrael v. Phelps, 144 Wis. 1.

party tickets within reasonable limits, while, at the same time, permitting any body of citizens whose number is sufficient to give importance to a concerted political movement to organize as a party."

In *State ex rel. Plummer v. Poston,* 58 Ohio St. 620, 51 N. E. 150, 42 L. R. A. 237, it was said of a similar requirement:

"Some restriction upon the right to have nominations printed upon the blanket ballot is necessary to render it practicable. In view of the small ratio of voters required to make a certified nomination, and in view of the right to have nominations made by papers or petitions signed for that purpose, and of the right conferred by the act upon every voter to supply the names of all persons for whom he may desire to vote, we cannot say that the exercise of the right is unreasonably impeded." From this one of the ablest members of the Ohio bench dissented.

See, also, *State ex rel. Runge v. Anderson,* 100 Wis. 523, 76 N. W. 482, following the foregoing cases.

In *State ex rel. Webber v. Felton,* 77 Ohio St. 554, 84 N. E. 85, where the fraction required was ten per cent. and exceeded largely the percentage required in any of the preceding cases, the court said:

"One man cannot constitute a political party; and the abuses that it was intended to prevent depend largely upon the number of those who constitute the party, and this makes it perfectly proper for the legislature to limit the application of the law according to number. The Australian ballot laws limit the party tickets that may appear on the printed ballot, by a percentage of the vote cast at a previous election, and in nearly every case in which objection has been made on that ground such laws and legislation have been upheld."

This was said in a suit to enjoin the state supervisor and inspector of elections and others from incurring any expense in the preparation for and holding of a primary election and from holding such primary election. In all the statutes considered in the foregoing cases there are also, I think, alternative provisions for placing a party candidate on the official

ballot. In the following cases it was held that a statute which prohibited the election of delegates to the convention of a political party representing less than a designated percentage of the vote cast at the last election was unconstitutional and void as taking away the right of self-control and self-preservation from a party; that there was involved not a question of reasonableness of the regulation but of the power of the legislature to pass any such law. The law here held invalid required three per cent. of the votes cast by the party at the last election. This power was denied. *Britton v. Board of Elec. Comm'rs,* 129 Cal. 337, 61 Pac. 1115, 51 L. R. A. 115; *Spier v. Baker,* 120 Cal. 370, 52 Pac. 659, 41 L. R. A. 196; *Murphy v. Curry,* 137 Cal. 479, 70 Pac. 461.

These pioneer cases are cited to show for what reason such statutes were upheld where there was an official ballot and under what circumstances and for what reasons such statutes were held invalid. Under the statutes of this state first above referred to the candidate of a political party must obtain a stated percentage of the voters of his party at the last presidential election in order to be placed upon the official primary ballot. When the legislature has enacted this requirement and, pursuant thereto, the candidate has obtained the required percentage and qualified himself for a place on the official primary ballot, can the candidate be required to procure an additional and increased percentage thereafter to entitle this candidate to a place on the official election ballot? The reasons given for sustaining similar regulatory statutes in the above cited cases would seem to answer this in the negative. The legislature, having acted on the subject and prescribed a regulation to which the candidate must conform, has exhausted its police power of regulation with reference to percentages of the party vote if this power is grounded on the considerations stated in the foregoing precedents. It has fixed what it has considered a reasonable number in order to entitle the candidate to have his name on the official ballot.

Certainly there must be some ground upon which the require-
ment of a subsequent and increased percentage may be sup-
ported; certainly the reason in support thereof stated in the
foregoing cases no longer obtains.   The official ballot for the
general election cannot thus be loaded down with names or
parties, because only one candidate of each party for one office
can obtain a plurality of votes at the primary, and because no
party can have a place on the official general election ballot
which is not represented on the primary election ballot.   Only
three grounds for upholding this statute in question as a valid
police regulation are suggested: (1) that the legislature may
within limits prescribe the number of votes necessary to en-
title a person or party to a place on an official ballot; (2) that
the law is or may have been intended for the benefit of the
party, because encouraging its members to attend and take
part in the nominating election; (3) that the law is intended
to prevent the members of one political party dictating the
nominations of another.   If we grant the first proposition the
law will be found invalid, because, although it has been held
that some small percentage of voters may be required as a con-
dition of printing the name of a candidate on the official bal-
lot, this is placed on the ground that such requirement is nec-
essary to make the ballot effective and prevent it being loaded
down with a multitude of names placed upon it by small neg-
ligible groups of voters.   But the official election ballot cannot
be loaded down in this way with party names, because, as
said before, only the one candidate on the primary official
ballot who has received the plurality of votes can be placed
upon the official election ballot.   The regulation must be
based on some necessity therefor.   This first reason for sup-
porting the act therefore fails.   The statute, so far as the first
reason for its support is concerned, becomes a mere arbitrary
requirement based on no necessity for such regulation, and
because it also impinges upon and impairs constitutional
rights it is invalid.   The statutes in question prior to the en--

actment of ch. 477, Laws of 1909, had already exercised this police regulation with respect to the primary election ballot, and the superadded requirement with respect to the enlarged percentage to be obtained at the primary in order to be entitled to a place on the general election ballot is so useless for the purpose stated and so large as to be a material impairment of the effective exercise of the right of suffrage. If the first required percentage necessary to entitle one to a place on the primary official ballot is reasonable, the superadded requirement of twenty per cent. is unreasonable.

With reference to the second ground of support, it requires an extraordinary stretch of credulity to arrive at the conclusion that this benevolent purpose towards its adversary actuated the dominant party in the passage of the law. But it is unnecessary to speculate on this, because the second consideration is no valid ground for the exercise of the police power. The welfare of party and whether or not a voter will continue to act in that party is for the voter to decide. If development or resuscitation of the party be once recognized as a proper basis for police regulation, that will from thenceforth be the principal care of the legislature. Therefore the statute cannot·be upheld on this ground, granting, as we must, that it does to a considerable extent impair the effective exercise of the right to vote.

The third ground of support is insufficient because the act has only a remote and indirect tendency to accomplish this purpose and because it seeks to accomplish this, if at all, by impairing the suffrage rights of those who have not attempted to vote in the party of the opposition as a punishment for those who did so vote or attempt to vote. If this be the ground of support, the statute is for this reason an unconstitutional restriction of their right of suffrage. *Camp v. Rogers*, 44 Conn. 291. Those who go to the primary and vote their party ticket have been guilty of no negligence or breach of duty, and their right thereafter to vote the same party ticket cannot be

limited on account of the negligence or default of others. *State ex rel. Wood v. Baker,* 38 Wis. 71; *Dells v. Kennedy,* 49 Wis. 555, 6 N. W. 246, 381. I also think that, even if we assume the authority of the legislature, the required percentage is unreasonably large and the statute in question invalid on that ground. According to the Blue Book the total Democratic vote for governor at the general election in 1904 was 176,301. In 1906, two years later, it was 103,114, a falling off of more than forty per cent. At the general election of November, 1908, it was 165,977, an increase of sixty per cent. over the vote of 1906. The fluctuations in the vote at the primary election are still more marked. The ratio of the primary vote to the general election vote is subject to still greater changes. Where the minority party has small hope of prevailing in the coming election there will always be a light vote at the nominating election. The law must recognize that thousands are concerned with the problem of existence and have many cares more engrossing than those of politics. To require a minority political party to cast at the primary election twenty per cent. of what was perhaps an unusually large vote cast for the gubernatorial candidate with the aid of independents or by reason of fusion with some other minority party or parties, must in the nature of things often exclude that party thereafter from any place on the official ballot. Where the law has this tendency and there is no imperative reason for the existence of the law, no such encroachment upon the right of suffrage should be tolerated. The only case which I find at all sustaining a similar law is *State ex rel. Montgomery v. Anderson* (N. Dak.) 118 N. W. 22, decided by the supreme court of North Dakota October 2, 1908. The reasons given for this decision do not commend themselves. The case seems to be decided upon the old fallacy that there is some point at which the reasonableness of a number, of a time, of an amount, may be apparent to all, and another remote point at which the unreasonableness thereof may be apparent to all,

and men may differ between these extremes; therefore a tribunal charged with the ultimate duty of determining the reasonableness or unreasonableness of the number, time, or amount should abdicate its function and refuse to discharge this duty out of regard to a determination already made which it is the duty of that tribunal to review.   The decision plainly misapplied the precedents it professed to follow and took a fundamentally erroneous view of police regulation of constitutional rights.   The dissenting opinion of Justice FISK in the case cited contains the better reason, and the supreme court of North Dakota, while the instant case was on argument, overruled the decision mentioned, and as we understand it adopted the views against the constitutionality of the law set forth in the dissenting opinion of Justice FISK.   I thus find the precedent discredited in the place of its origin in the most effective manner, and in its place a precedent advisory to us, it is true, but strong against the constitutionality of the act under consideration.   Where a court overrules its own decision on a question of constitutional law it must be strongly persuaded of the correctness of the overruling decision.

.With these considerations applying to the law as a whole we come down to an examination of the act in detail.   This act of 1909 excludes from the official ballot for the general election as party candidates all persons in all cases where all the candidates on the official primary ballot for any one office received less than twenty per cent. "of the vote cast for nominee of such party for governor at the last general election."   If the statute is to be taken literally, it requires each candidate to receive at the primary twenty per cent. of the total party vote for governor at the last preceding election.   Because there are 71 counties and 100 assembly districts in this state, few of the counties and probably no assembly district could upon a full poll muster twenty per cent. of such vote.   Taken. literally, then, the statute is void and unconstitutional on its face.   Assuming that the legislature could not have intended

this, we are to search for its intention.    Two possible mean-
ings may be found.    One that it was intended that the re-
quirement of twenty per cent. should apply only to candidates
for state offices; the other that the words, "of the vote of the
state or of the county or district in which such person is a can-
didate," be read into the law following the twenty per cent.
requirement so as to qualify or limit the generality of this re-
quirement.    But this court has heretofore refused to inter-
polate words into a statute in order to uphold its constitution-
ality.    *Rogers-Ruger Co. v. Murray,* 115 Wis. 267, 91 N. W.
657.    In *Bonnett v. Vallier,* 136 Wis. 193, 116 N. W. 885,
where the New York tenement house law was by some legis-
lative oversight so enacted in this state as to apply to all parts
of the state, urban and rural, the law was declared void as an
unreasonable exercise of the police power interfering with
property rights.    A mere interpolation limiting the state-wide
effect of this law would have saved it.    The *Trade-mark
Cases,* 100 U. S. 82, 99, seem to be directly in point here.
See, also, *Johnson v. Barham,* 99 Va. 305, 38 S. E. 136;
*Slingluff v. Weaver,* 66 Ohio St. 621, 64 N. E. 574; *Dewey
v. U. S.* 178 U. S. 510, 20 Sup. Ct. 981.

I think it much more reasonable to construe this statute as
applying only to state officers, and this construction would re-
quire no interpolation of words.    This construction would
grant the writ to some of the relators.    But having got into
the statute the saving words by a process euphemistically
called construction, the statute is still unconstitutional.    Be-
cause in the first place the percentage required is based not on
the party vote but on the vote for one candidate.    It often oc-
curs that the best service which a voter can render to his party
and to the state is to vote against a nominee of his own party.
When the party offers as a candidate for governor a man who
is notoriously unfit or corrupt, or who has bought his nomina-
tion with money, it is the duty as well as the right of all mem-
bers of that party to vote against this candidate.    This is a

right which cannot be impaired by legislation. Any law which impairs this right is unreasonable and invalid. So is this law which forbids the voters of a county or district so to do on pain of loss of party place on the official ballot at the next ensuing election. There can be no twenty per cent. of zero. So if, instead of merely failing to vote for such unworthy candidate of their own party for governor, the voters in like case in a particular county or district cast a unanimous vote for his worthy opponent, their right to do this is likewise impaired because they can only do it at a loss of their party place on the official ballot at the next election. So in a case where for the foregoing reason and by reason of the great popularity of the worthy candidate of a minority party this candidate receives large accessions to his small party vote in a county or district, which accessions are from other parties or independent voters. In the latter case at the next succeeding primary this minority party cannot muster in the county or district twenty per cent. of the former abnormally large vote cast for its candidate for governor because such large vote was not composed of a strict party vote. Having been thus eliminated from the official ballot for one year there is no practical way provided for in our statutes to be replaced on the official ballot. Thus the law so construed interferes with the right to exercise the elective franchise and in effect penalizes its lawful and proper exercise and consequently is invalid. It is no answer to this to say that the office of governor is fairly representative of the party vote or that the instances are rare in which an undesirable candidate for that office will be nominated or an extremely popular candidate of the minority party for that office will be able to draw so largely from other parties. This begs the whole question. The act cannot be constitutional in some instances and unconstitutional in other related instances. Basing the percentage upon the party vote for one candidate does tend to constrain the voter to cast his ballot for that candidate regardless of his personal merits,

even though such candidate be unworthy or undesirable, and this interferes with his free choice and is therefore invalid. The law with this interpolation would also be subject to the former objections herein noted against the law as a whole. Indeed, with the interpolated words the effect of the law in impairing the suffrage rights of the nineteen per cent. who have attended the primary and voted because of the delinquency or default of those who did not attend or those who, having attended, voted some other party ticket, would be greatly accentuated because limiting it to districts would cause it to lack the corrective influence to which it might be subject from the contrary vote of other districts when the vote of the whole state is considered.

Again, with the words above quoted, whether their addition be matter of construction or interpolation, the act permits the elector to vote a party ticket for member of the state assembly in all cases where within this assembly district there was cast at the primary twenty per cent. of the vote for that party candidate for governor at the last preceding gubernatorial election. It however denies to this same voter the right at the same election to vote a party ticket for representatives in Congress where at the same primary there was cast in the Congressional district less than twenty per cent. of the same party vote in that Congressional district for governor at the last preceding gubernatorial election. The voter in that case can have no party representative in Congress. Although he has the right to favor and vote to advance the principles or measures of one party in state affairs and those of a different party in federal affairs, he is barred from any participation in the selection of a candidate for Congress because he conscientiously prefers the policy or attitude of the other party in state affairs and desires to act with it. Here he must yield up one right or the other, and he cannot lawfully be compelled to yield either at the legislative whim. But in case the voter desires to associate himself with a political party in both state

and national affairs he may find that he is entitled to vote a party ticket for member of assembly, but that there can be no party nominee for Congress, so that he must lose his vote for Congressman or else vote for an independent candidate, or for the candidate of some opposition party in whose principles he disbelieves.    Representatives in Congress are to be elected by the people of the several states by electors possessing the qualifications which entitle them to vote for the most numerous branch of the state legislature.    Const. U. S. art. I, sec. 2. Construing this, it is said in *Ex parte Yarbrough,* 110 U. S. 651, 4 Sup. Ct. 152: "It is not true, therefore, that electors for members of Congress owe their right to vote to the state law in any sense which makes the exercise of the right to depend exclusively on the law of the state."    See, also, *Swafford v. Templeton,* 185 U. S. 487, 22 Sup. Ct. 783; *Wiley v. Sinkler,* 179 U. S. 58, 21 Sup. Ct. 17.    Within the meaning of the federal constitution as interpreted in these decisions, I think the voter qualified by state law to vote for member of assembly on a party ticket and thereby for party principles or measures cannot be denied by state statute, directly or indirectly, contingently or absolutely, the right to cast an equally effective ballot for his representative in Congress or the right to participate as a member of a political group or party in the selection of a candidate for Congress.    Again, the law as thus interpolated or interpreted is destructive of the right to form and maintain political parties and thus indirectly or in effect vote for principles or measures.    No political minority party could long exist where, by the effect of a statute, county after county and district after district would inevitably be left without party organization or party representatives.    The party could not long survive the destruction of its local units.    That this is the necessary effect of the statute in question cannot be doubted.    Its enforcement must result in a progressive but certain destruction of a minority political party and leave the voter no choice but to vote for an irresponsible independent

candidate or to join the majority party and create a disturbance in its ranks. We have searched the statute laws in vain for any provision whereby a political party, having been once refused a party place for its gubernatorial candidate on the official general election ballot, can ever appear again as a party at an election. The statute expressly provides that all candidates shall be nominated either by a primary election or by nomination papers signed and filed. A nomination paper may be filed signed by a stated number of voters.

"In using words to express the party or principles represented by a candidate nominated by a nomination paper, if the same name is used as pertains to some political party making a nomination by convention, the words 'nomination paper' shall be used as a part of such designation." Sec. 30, Stats. (1898).

At the general election following the nominations no ballot except the official ballot can be voted. There the regular party tickets nominated at the primary election are to be printed each in a separate column. This last statute as it now stands includes the words "nominated by conventions," but these words are rendered nugatory by the later statute (ch. 666, Laws of 1907), which provides (sec. 11—2, Stats.) that all candidates must be nominated either at the primary or by nomination papers. The statute also provides: "The names of persons nominated by paper nominations shall be placed in the one or more columns [of the official ballot] designated independent." There is no way to ascertain how many voters of any party voted for either one of these independent candidates, consequently in such case the statute relative to percentages could not thereafter be complied with. Construing the statute in question to apply to candidates for county and district offices, the party voters would lose their right to vote a party ticket at one election, but about two years thereafter, at the primary election following the next gubernatorial vote, appear at the primary and endeavor to poll twenty per cent.

of the last party gubernatorial vote in that district or county. But when the gubernatorial party candidate, by operation of this statute, is once eliminated from the official ballot there is no way in which the party can ever get back on the official ballot. These are extraordinary difficulties put in the way of the exercise of the elective franchise, they rest upon no legitimate excuse or occasion for the exercise of the police power, they impair inherent rights recognized and upheld by our state constitution, and they are, I believe, unreasonable and unconstitutional.

The following opinion was filed December 14, 1910:

WINSLOW, C. J. (*dissenting*).    I agree fully with Mr. Justice TIMLIN's views as to the merits of these cases; I do not share his doubt as to the meaning of the law.    I am quite well satisfied that it can and must be construed as applying as well to every subordinate election district in the state as to the state at large, and means that in each election district a candidate for an office limited to the district must receive at the primary election at least twenty per cent. of the vote cast by his party for governor in that district at the last preceding general election in order that his name may be placed in the party column on the official ticket.

In view of the importance of the case and the utterly indefensible character of this law, as it seems to me, I desire to add some comments of my own in as few words as I may, without elaboration or citation of authorities.    We are guaranteed a republican form of government.    That means a government where the sovereign power rests in the qualified electors and is actually exercised by officers chosen by them.    When, therefore, the constitution defines the qualifications of electors, there is at once conferred upon those electors the right to vote, and that right no legislature can take away.    There needs to be no express guaranty of the right in the constitution; it is

that right which makes the form of government republican. It cannot be taken away or materially impaired, because to take it away or materially impair it is to destroy the republican form of government. The right to vote means the right to vote effectively; not merely to cast a ballot under circumstances where it is certain that it can have no practical effect, but to be able to record the voter's will both as to men and as to measures in the most effective manner which is reasonably practicable, consistently with the preservation of order and the securing of an honest ballot.

There may be legislative regulation of this fundamental right for the purpose of preventing corruption or coercion of the electorate, for the purpose of making it impossible for illegal votes to be cast, and for the purpose of securing an orderly, speedy, and honest casting of the votes and ascertainment of the result.

All legislative restraints, conditions, or impediments to the voter's freedom of action which do not tend to accomplish one of these purposes, but which make it difficult for him to cast his vote with the fullest practicable effect, either for principles or men in either state or national elections, have no constitutional justification for their existence. The weapon that "executes a freeman's will" must be free if the man who wields it is to be truly a freeman. It is true that political parties as such have no constitutional rights guaranteed to them, and hence the specious argument is made that this law cannot be held unconstitutional because it affects or regulates only the party and not the voter himself. This argument I regard as absolutely fallacious.

We all know that a republican government is and must be a government by party. Whether it would be better if it were otherwise is beside the question. All human experience up to the present time has shown that it cannot be otherwise so long as human nature remains as it is. No significant change in governmental methods, no program of reform which is

worth the name, no considerable scheme for the betterment of the race or the improvement of its conditions, can be instituted and carried through except by means of an organization such as we call a party. This is a condition and not a theory, and it must be recognized when parties are to be legislated against.

If, by legislation nominally directed against parties only, the individual voter stands in danger of being deprived of his effective voice in either state or national affairs, such legislation cannot be justified any more than direct legislation against the voter himself which has like effect can be justified. That such is the character of this legislation seems to me certain. While in terms aimed at a party, in effect it is likely at any time to deprive the diligent member of a great minority party of his right to effectively vote for the principles he believes in, because other members of his party are not diligent. This court has decided that no registration law can absolutely deprive a constitutional voter of his right to vote because of his own neglect to register his name, but must give him an apportunity to cast his ballot on proving his qualifications. *Dells v. Kennedy,* 49 Wis. 555, 6 N. W. 246, 381. Here, however, we have a law which is likely at any time to deprive a legal voter of the possibility of casting an effective vote, not because of his own neglect, but on account of the neglect of others. I say "effective" vote, because it is common knowledge, so far as state or national elections are concerned, that the privilege of casting a vote in the independent column and not in any party column is of no value. Such votes are mere shots fired in the air. They are votes in form. They may satisfy the unthinking voter, but they accomplish nothing. They are practically votes thrown away.

The member of a minority party is the person who is chiefly in danger of thus losing his power of effective voting. This is very plain, as it seems to me. Whether any considerable number of voters get out to vote at the primaries must always depend upon the interest felt by the voters in the re-

sult.   In a majority party there will always be interest, for
there will always be candidates for the offices, both state and
local, who will be pushing for the nomination and making ac-
tive campaigns, because nomination will be considered almost,
if not quite, equal to election.   In a minority party, on the
other hand, few persons will wish for the nomination and
there will be competition only in rare instances.   The con-
sequence of this condition is not only certain as matter of
theory, but equally certain as matter of history in this state.
The fierce fight in the majority party will draw many of the
lukewarm minority into the majority primaries; the minority
primaries will be neglected; and thus it will be quite probable
that the required twenty per cent. of votes will not be cast at
the primary.   When this happens on the primary vote for
governor (as it has already happened once in this state prior
to the existence of this law), the death knell of the party has
been rung and the funeral ceremonies may well begin, for
from that time on there can never be any standard from which
to reckon the twenty per cent. in future elections.   Nor can
there be any resurrection, because the law apparently affords
no opportunity for a new party to become recognized as such,
or for an old party which has once failed in securing the
twenty per cent. to draw the breath of life again.   Thus it
may easily happen that a large body of voters composing nine-
teen per cent. of a great national party in the state may per-
form every political duty required of them and diligently at-
tend the primaries, yet, because their party companions are
tempted to take part in the fierce contests going on in the
ranks of the majority party, or are apathetic in early Septem-
ber and deem it more profitable to attend to their ordinary
business rather than to go to the polls, may lose all power of
effective voting, not only for one election but for all time to
come, unless the law be changed.   When it is considered that
in this manner diligent voters may be easily rendered unable
to effectively vote for Congressmen and for presidential elect-

ors and so be deprived of any voice in the great questions which are fought out in the political battle-field of the nation, the vicious character of this law becomes more apparent.

In my judgment the legislature cannot thus impair the diligent voter's right to cast an effective ballot. If it be desirable to enact legislation to keep the voters of one party out of the primaries of the other party, there are ways in which it may be done without penalizing the voter who has performed his whole duty. The punishment should be fitted to the crime and should be inflicted on the guilty party and not upon his innocent neighbor.

The act is wrongly entitled. It should be called "An act to ensure the gradual extinction of all minority parties."

The following opinion was filed December 19, 1910:

BARNES, J. The law under discussion may have been intended to accomplish any one of several purposes. I do not assume to know what its real object was. It may have been and probably was intended to prevent members of one party from voting for the candidates belonging to some other political faith in the primaries. If this be the object of the act, it is easy to imagine how its purpose could be more fairly and more effectively carried out by the enactment of a law of an entirely different character. But the legislature is not bound to adopt any particular means of bringing about such a result, and I am not prepared to say that the legislature was not acting within the field of its discretion in attempting to remedy the incongruity aimed at in the particular way in which it did. Assuming that the right existed to reasonably regulate primary elections in the manner attempted, the percentage adopted is not so high as to clearly indicate bad motives or sinister purposes. I reached the conclusion arrived at by the majority of the court, although by a somewhat different process of reasoning. I do not desire to do more than state my

conclusions, as this case has already produced a bountiful supply of legal literature. In its practical workings and effect the law is likely to operate temporarily to the disadvantage and demoralization of minority parties. That it will do so permanently, I do not believe. After all, the people are imbued with a sense of fair play and have little tolerance for an unfair fight. Such a law should tend to revivify any minority party that had a spark of vitality left, rather than to relegate it to the oblivion of the past with other "has beens." So I believe that laws of this kind react on those responsible for their passage when their import becomes generally known. I have no sympathy with this law, but this is beside the question. The constitution places the lawmaking power with the legislature. Except as it may be prohibited from exercising that right by that instrument or otherwise, it has just as much power to pass a bad law as it has to pass a good one. When it acts in the field of its discretion its action is not subject to revision or to any censorship other than that which the majority of the people may thereafter exercise through the ballot.

The constitution nowhere recognizes political parties. It provides that every male person of the age of twenty-one years or upwards, belonging to any of the several classes enumerated, who shall have resided in the state, and in the election district in which he offers to vote, the required length of time, "shall be deemed a qualified elector at such election." Sec. 1, art. III, Const. This is the only provision of the constitution which it is argued is violated by the so-called "twenty per cent. law." The constitution simply prescribes what *qualifications* the elector must have before he is entitled to vote. It purports to confer no right except that to vote where the elector possesses the requisite qualifications. The twenty per cent. law does not undertake to prescribe any qualification for the elector, nor does it assume to prevent him from voting for any person or persons whom he wishes to vote for. It simply

provides that before a political party can have recognition as such on the official ballot it must have cast a certain vote at the primaries. To say that, because the constitution requires a resident of the state to have certain *qualifications* before he can vote at all, it also guarantees that any political party with which he chooses to affiliate shall occupy a regular place on the official ballot, is in my judgment altogether too far fetched. I fail to see where one result follows as the logical consequence of the other. I am unable to bridge what I deem to be the chasm between the qualification of the voter and the right of a political party to a place on the ballot, and to hold that there is any constitutional disqualification of the voter because his party may not cast the required number of votes at the primary to secure a place on the ballot. It seems to me that the object of the 1909 amendment to the primary election law is too remote from the provision of the constitution referred to to be considered as an invasion of it. A law cannot be declared unconstitutional unless it clearly appears that it is so, and I am unable to see any such clear violation of the constitution as would warrant me in condemning the law.

This court adopted the rule at an early date that a law may be declared void though it violate no specific provision of the constitution. *Durkee v. Janesville,* 28 Wis. 464. This rule has been subsequently followed. At best it is a rule that should be sparingly applied. That deference which one coordinate department of the government owes to another forbids the exercise of such power except in extreme cases. It is only where a law operates unequally and perpetuates plain and palpable injustice, incompatible with the natural and inherent rights of the individual, that it should be held void where it does not run counter to any constitutional guaranty. I do not think that ch. 477, Laws of 1909, falls within this category of legislative acts or that it runs counter to the preamble or declaration of rights in the constitution, assuming that those provisions can be construed as having any applica-

58    SUPREME COURT OF WISCONSIN.    [Nov.

tion whatever to the right of suffrage. I supposed it was the settled law of this state that "mere party fealty and party sentiment, which influences men to desire to be known as members of a particular organization, are not the subjects of constitutional care," and that, so long as "the right of the individual to vote for the candidate of his choice is not interfered with," the constitutional right guaranteed is not infringed. *State ex rel. Runge v. Anderson,* 100 Wis. 523, 536, 76 N. W. 482.